579 So.2d 1066 (1991)
BETH ISRAEL
v.
BARTLEY, INC. and Seaboard Surety Company of New York.
No. 89-CA-2192.
Court of Appeal of Louisiana, Fourth Circuit.
April 18, 1991.
Rehearing Denied June 18, 1991.
*1067 James B. Irwin, V, Gustave A. Fritchie, III, Montgomery, Barnett, Brown, Read, *1068 Hammond & Mintz, New Orleans, for plaintiff/appellee.
Douglas A. Kewley, Gardner & Kewley, Metairie, for defendant/appellant, The Celotex Corp.
Before GARRISON, BARRY and PLOTKIN, JJ.
BARRY, Judge.
Celotex Corporation appeals a judgment which awards damages to Beth Israel Synagogue due to a defective roof.

PROCEDURAL HISTORY
Beth Israel filed suit January 17, 1979 against Bartley, Inc., [Bartley] a general contractor, and Seaboard Surety Company, its surety, based on breach of a building contract for construction of a synagogue and school building. Beth Israel had partially moved into the building on October 12, 1969, but a number of defects noted on a punch list had not been corrected by Bartley. Bartley and Seaboard Surety answered and filed exceptions of no cause and no right of action and prescription. No hearings was held on the exceptions.
By supplemental petition filed January 7, 1980 Beth Israel added defendants August Perez & Associates, Inc. [Perez], August Perez, Jr., and August Perez III, architects; Continental Casualty Company [CNA], insurer of Perez; Celotex Corporation [Celotex], the roof manufacturer, and Aetna Casualty & Surety Company, Celotex's bonding company. Beth Israel claimed that Perez breached its obligation to supervise construction and allowed Bartley to furnish substandard materials; alternatively, that Perez's specifications were defective. Beth Israel specified that the defective work included the built-up roof and remedial work and would far exceed the $4,340 amount of the bond. Beth Israel prayed for judgment against Celotex and Aetna jointly and in solido with all other defendants for $4,340 plus costs, attorney's fees and interest. Perez, Perez, Jr. and Perez III answered and claimed Beth Israel's claims had prescribed (re-urged in answer to the supplemental petitions).
In its second supplemental petition (filed May 30, 1980) Beth Israel stated that it accepted the work on June 18, 1970 subject to a reservation for specified defective work. Beth Israel alleged that it completed payment to Bartley under the mistaken impression that the defects had been remedied. Beth Israel claimed that Bartley failed to perform in a workmanlike manner, did not remedy the defects, and its failure to repair resulted in damages of $500,000.00. Beth Israel prayed that the defendants be cast in solido, plus costs and attorney's fees.
Bartley and Seaboard Surety answered the supplemental petitions and reiterated their exceptions. Celotex answered the supplemental petitions, alleged that any liability was limited to its $4,340.00 bond, and filed exceptions of no cause of action and prescription. Those exceptions were not tried.
In its third supplemental petition (filed November 22, 1983) Beth Israel alleged that Bartley, Perez, and Celotex knew or should have known that the construction was substandard due to defective materials, and the roof would leak and damage the inside of the building and its contents. Beth Israel pleaded res ipsa loquitur.
Trial was by a commissioner who found liability as to Bartley, Perez, and Celotex, except that Bartley and Perez were exonerated for repairs that could have been made in 1978. Celotex was denied mitigation of damages because Beth Israel undertook replacement of the roof as soon as it was aware it was defective. The commissioner made no award for mental anguish, inconvenience, humiliation and embarrassment. The commissioner recommended awards against: Bartley and Seaboard Surety Company, $40,818; Perez, $97,500 ($40,000 exterior, $40,000 interior damages; $17,500 professional costs); Celotex and Aetna Casualty & Surety, $218,816 ($123,816 exterior, $50,000 interior damages; $30,000 professional fees; $15,000 attorney's fees).
The commissioner awarded legal interest from the date of demand and all costs including expert fees. The commissioner dismissed August Perez, Jr. and August *1069 Perez, III because they acted in their corporate capacity.
In its judgment the trial court denied numerous exceptions to the report and adopted the commissioner's findings except for certain damages. The court deleted $7,224.31 in damages to be paid by Perez and $8,000 in damages plus $4,340 (Celotex's bond) from the amount to be paid by Celotex. The court granted a defense motion for a new trial because the complete transcript was not available when the judgment was rendered. Aetna's motion for a new trial (based on damages in excess of its roof bond) was also granted. The case was submitted on the record without additional argument or briefs. The court rendered judgment in favor of Beth Israel and against Perez & Associates, Inc. and Continental Casualty Company for $90,275.69; against Celotex for $206,476.00; against Aetna for $4,340.00 with a credit for $3,500.00; and against Bartley and Seaboard Surety Company for $40,818.00. All costs were to be paid by the defendants. Claims against August Perez, Jr. and August Perez III were dismissed with prejudice.
Celotex argues the trial court erred:
1) by allowing evidence on redhibition because it constituted an expansion of the pleadings;
2) by finding the redhibition claims had not prescribed;
3) by concluding that Beth Israel had proven damages with specificity;
4) by not allowing Celotex a credit for unjust enrichment/beneficial use;
5) by granting legal interest from judicial demand on attorney's fees.
Beth Israel answered the appeal, then filed a motion to dismiss its answer which was granted by this Court.
On October 17, 1990 Celotex filed under Chapter 11 of the U.S. Bankruptcy Code and a stay order (including all matters on appeal) was issued. On November 30, 1990 Beth Israel obtained an order to modify the stay to permit this appeal.

BACKGROUND
On June 29, 1966 Beth Israel contracted with Perez to design and provide contract administration for a synagogue and school building. Bartley was low bidder and entered into a $758,000.00 contract with Beth Israel on July 26, 1968. During construction two changes were made without Beth Israel's approval (allegedly pursuant to industry custom): (1) the plaster and material on the exterior of the building was changed; (2) the roofing system was changed from 4-ply to 2-ply. The roof was completed October 1, 1969 and Beth Israel occupied portions of the building soon after. The building was completed in December, 1969 except for punch list items. The roof bond is dated February 3, 1970. The building was accepted June 4, 1970 (registered June 18) although the punch list had not been completed.
One punch list item involved a section of defective aggregate panel. Over time other areas began to crack and fall off. In 1975 Gene Erwin, an expert in lathing and plaster, recommended removal of the Bondcoat on the exterior aggregate panels. In 1976 Perez advised removal of the deteriorating aggregate panel.
Soon after the project was accepted Beth Israel observed leaks inside the building and informed Bartley. In August, 1970 there were complaints of roof leaks in several areas which were repaired by November 24, 1970. A leak in the kitchen was repaired on December 30, 1970 and again on September 2, 1971. By March, 1972 the leak re-appeared along with a leak below the clerestory. Bartley had a subcontractor make additional repairs.
In the summer of 1972 after a hard rain Beth Israel contacted Bartley and Perez about additional leaks. Bartley claimed the problem was due to lack of maintenance, but Bartley had subcontractors perform caulking and maintenance work. In March, 1973 more leaks occurred and Bartley requested Celotex to inspect the roof. In April, 1973 representatives of Bartley, Perez, Celotex, and Beth Israel made an inspection of the building. Numerous problems and leaks were found, many of *1070 which Bartley and Perez blamed on lack of maintenance. Bartley performed additional maintenance work.
Celotex paid a roofer to repair a "fishmouth" on the roof. Celotex said blisters were not its responsibility unless they affected the integrity of the roof. Leaks reported in May, 1975 were still considered maintenance problems by Bartley and Perez. A Celotex representative, Tom Brooks, inspected the kitchen roof and recommended replacement of the entire equipment well roof. Celotex paid for replacement of the roof's membrane and flashing and recommended that tread be placed on the roof over high traffic areas. In 1975 the original roofing subcontractor, Chassanoil, installed new metal counter flashings (to raise the height to 8 inches) over the existing counter flashings at the lobby roof, air-conditioning equipment well and around the clerestory. Celotex inspected in March, 1976 and concluded the leaks were not covered by the roof bond.
By 1978, at Beth Israel's request, Perez worked up a proposal for a number of repairs (which included removal of the aggregate panel) at a cost of $66,166.00, but no work was performed. Bartley and Perez inspected the building on March 14, 1979 and found numerous leaks and other problems.
In 1980 Beth Israel retained Turchi-Cusick-Drew, Architects, Inc. [TCD] to investigate the problems, including the leaks and defective aggregate panel. TCD contacted Construction Consultants, Inc. [CCI] and a contract with TCD was signed in 1981. In the summer of 1981 Dennis McNeil inspected the roof and advised TCD that the roof had failed and replacement was necessary. In July, 1982 Beth Israel contracted with A.L. Sizeler Construction Company to repair the synagogue and education building. Palmyra Industries replaced the roof with a 4-ply coal tar pitch roof. When the original roof was removed, large amounts of water were found beneath the membrane.

REDHIBITION EVIDENCE
Celotex argues that Beth Israel originally asserted a claim against Bartley and Seaboard in contract, but was allowed to introduce redhibitory evidence that was not related to its pleadings. Celotex objected to the evidence as an expansion of the pleadings and claims that evidence should not be considered by this Court. Celotex argues the judgment against it should be reduced to $840.00, the balance on the roof bond. Beth Israel responds that its claims on the bond were in redhibition and products liability.
Redhibition is defined in La.C.C. Art. 2520:

Redhibition is the avoidance of a sale on account of some vice or defect in the thing sold, which renders it either absolutely useless, or its use so inconvenient and imperfect, that it must be supposed that the buyer would not have purchased it, had he known of the vice.
A seller is bound by an implied warranty that the product is free from hidden defects and is reasonably fit for its intended use. Media Production Consultants, Inc. v. Mercedes-Benz of North America, Inc., 262 La. 80, 262 So.2d 377 (1972). Defect refers to the lack of necessary components or the level of quality which renders the thing absolutely useless or so inconvenient that the buyer would not have purchased the product. Harper v. Coleman Chrysler-Plymouth Dodge, Inc., 510 So.2d 1366 (La.App. 3rd Cir.1987).
The buyer may prove that the product is not reasonably fit for its intended use or that it is defective, without being required to prove the exact underlying cause for the problem or malfunction. The buyer may prove the defect by direct evidence or by circumstantial evidence which gives rise to a reasonable inference that the defect existed. The defect must be proved more probably than not by a preponderance of the evidence. Rey v. Cuccia, 298 So.2d 840 (La.1974).
The consumer's action is enforceable against the manufacturer as well as the seller, but the manufacturer is presumed to know the defect. Tuminello v. Mawby, 220 La. 733, 57 So.2d 666 (1952). *1071 Non-privity is not a barrier to a suit by the ultimate consumer against the manufacturer. Rey v. Cuccia, 298 So.2d at 840; Stelly v. Gerber Products Company, 299 So.2d 529 (La.App. 4th Cir.1974), writ denied 302 So.2d 616 (La.1974). When the action is against the manufacturer, proof need only be made that the defect occurred in the manufacture of the product. Moreno's Inc. v. Lake Charles Catholic Schools, Inc., 315 So.2d 660 (La.1975). The buyer need not tender a defective product to the manufacturer prior to suit. Associates Financial Services Co., Inc. v. Ryan, 382 So.2d 215 (La.App. 3rd Cir.1980). The manufacturer is answerable in damages as well as restitution of price and repayment of expenses including reasonable attorney's fees. La.C.C. art. 2545.
Celotex states that evidence on redhibition was allowed because it was admissible against other defendants whereas it might not be admissible as to Celotex. That contention is not totally accurate. In its brief Celotex notes its first objection was made during the testimony of James Davis, vice-president of Sizeler Construction Company, who was asked whether he had seen another bond ply roof by Celotex. Counsel for Celotex objected that the question was beyond the pleadings which simply alleged that Celotex and Aetna insured the roof. Celotex claimed there was no allegation that it sold the roofing material used on the building and the pleadings only referred to the bond as an insurance policy. Beth Israel's counsel referred to the second supplemental petition and Celotex's interrogatory # 34 (to Beth Israel) which asked for information about the alleged defect.
The commissioner stated that Beth Israel's second amended petition requested an award in solido. The commissioner said Mr. Davis' answer about other Celotex bond ply roofs might be relevant as to the other defendants even if it were not relevant to Celotex. The commissioner concluded that whether Mr. Davis had seen similar Celotex roofs did not enlarge the pleadings and overruled the objection. Mr. Davis noted a similar roof on the Aurora Village Shopping Center which had serious problems.
There were other instances of similar objections. During questioning of Samuel Shear, president of Beth Israel from November, 1978 until November, 1984, Celotex's attorney objected (not noted in brief) when Mr. Shear was asked when he discovered a roof problem. Counsel argued that question may be admissible as to other defendants but not to Celotex because it would expand the pleadings. The commissioner overruled the objection. Mr. Shear testified that TCD, the architectural firm, suggested the congregation retain CCI, Construction Consultants Inc. in 1981. Mr. McNeil of CCI informed the congregation that the 2-ply roof had numerous blisters and bubbles, and water was going through in a number of areas.
Celotex objected (not mentioned in brief) to the introduction of Edwin Rissmiller's deposition, a former Celotex employee and roofing consultant, because it would expand the pleadings. The commissioner overruled that objection. Celotex's objection during the testimony of Dennis McNeil of CCI when he was asked about the number of coated felt roofs he had observed was also overruled.
The trial court's reasons for judgment covered Celotex's exception to the expansion of the pleadings. The court noted that Celotex and Aetna were added as defendants in the amended petition filed on January 7, 1980 based on the 20-year roof bond. Paragraph 9 of that petition states that the roofing system failed and the building had roof leaks in many areas, and asked that all defendants be held in solido. The court noted the May 30, 1980 second supplemental petition which expanded the complaint against Celotex and again prayed for judgment in solido. In the third supplemental amended petition filed November 22, 1983 Beth Israel alleged that some materials were defective and the defendants, including Celotex, knew or should have known of the defects.
The court concluded "that the first amending petition, which states that the roof in question failed, and the third supplemental *1072 and amending petition, which alleges defects in design, each state a cause of action in redhibition." The court concluded that Beth Israel pleaded redhibition and the commissioner properly admitted evidence on redhibition against Celotex.
Paragraph 9 of Beth Israel's supplemental petition adding Celotex provides: "A portion of the substandard and defective work as alleged herein involves the built-up roof system...." At that time Beth Israel requested Celotex and Aetna be held jointly and in solido with all remaining defendants for $4,340.00, the amount of the roofing bond. In the second supplemental petition Beth Israel prayed for judgment against all defendants including Celotex, jointly and in solido, for $500,000.00, plus attorney's fees and costs of remedial work.
Clearly, Beth Israel sued Celotex on claims of products liability and/or redhibition and not only on the roof bond. In the third supplemental petition paragraph 23 states "that due to the faulty design of the building and the substandard construction of the building and the defective materials used on the building," Perez, Bartley, and Celotex "knew or should have known by proper judgment and considering their expert knowledge that the building was going to leak and in doing so would cause damages to the inside of the building as well as its contents."
We conclude that testimony on the tort and/or redhibition claims was properly allowed.

PRESCRIPTION
Celotex argues that any redhibition claim prescribed after one year. Beth Israel responds that Celotex never pursued its exception and abandoned that argument. Because an exception of prescription may be raised at any time, we will consider its merits.
Traditionally, builders, craftsmen and manufacturers have been held to a high standard of accountability for their workmanship. Tuminello v. Mawby, 57 So.2d at 666. The manufacturer of a product is presumed to have knowledge of any defect in what he makes; therefore a claim is timely if the year has not elapsed since discovery of the vice. Discovery is not presumed. It must be proven by the seller/manufacturer. La.C.C. Art. 2546; Schwehm v. Superior Pontiac Company, 463 So.2d 22 (La.App. 5th Cir.1985). The manufacturer has the burden of proving by a preponderance of the evidence that the purchaser discovered the vice more than one year prior to filing suit. Jordan v. Employee Transfer Corporation, 509 So.2d 420 (La.1987).
Liberative prescription of one year is also applicable to delictual actions so that a products liability claim is also subject to a one year limitation from the injury or damage or from the date the victim became aware of the defect. La.C.C. Art. 3492; Hamm v. Amy, 544 So.2d 691 (La.App. 3rd Cir.1989). One year from Beth Israel's discovery of the roof's vice or defect is the applicable standard.
Prescription does not commence to run until the plaintiff has actual or constructive knowledge of the tortious act, the damage caused, and the causal relationship between the tortious act and the damage. Reed v. General Motors Corporation, 400 So.2d 919 (La.App. 1st Cir.1981), writ denied 406 So.2d 625 (La.1981). A person cannot bring suit until his cause of action has accrued and therefore prescription cannot run until that time. Guderian v. Sterling Sugar & Railway Company, 151 La. 59, 91 So. 546 (1922). Mere apprehension that something might be wrong is not sufficient. Griffin v. Kinberger, 507 So.2d 821 (La.1987).
Under the doctrine of contra non valentem agere nulla currit praescriptio, prescription does not run against one who is ignorant of the existence of a fact that would entitle him to bring suit as long as that ignorance is not willful and does not result from his own neglect or negligence (even if his ignorance was not induced by the defendant). The doctrine also prevents the running of prescription where the debtor/manufacturer has concealed the fact of the obligation/defect or has committed other acts to prevent the *1073 creditor/buyer from ascertaining knowledge of the existence of the defect or availing himself of his cause of action. Corsey v. State Through Department of Corrections, 375 So.2d 1319 (La.1979). See Young v. Clement, 367 So.2d 828 (La. 1979); Cartwright v. Chrysler Corporation, 255 La. 597, 232 So.2d 285 (1970).
Prescription does not run as long as it is reasonable for the victim/plaintiff not to recognize that the condition or problem may be related to the treatment or defect. The focus is on the reasonableness of the tort victim's action or inaction. Griffin v. Kinberger, 507 So.2d at 821.
Prescription will not begin to run at the earliest possible indication that a plaintiff may have suffered some wrong. Prescription should not be used to force a person who believes he may have been damaged in some way to rush to file suit against all parties who might have caused that damage. On the other hand, a plaintiff will be responsible to seek out those whom he believes may be responsible for a specific injury.
Jordan, 509 So.2d at 423.
The commissioner noted that acceptance of the building was registered on June 18, 1970. The initial petition was filed on January 17, 1979 and the petition adding Celotex was filed January 7, 1980. The suit was timely as to the ten year prescriptive period for breach of contract against Bartley and Perez and within the ten year peremptive period for a suit involving deficiencies in design, supervision, or construction of immovables or improvements pursuant to La.R.S. 9:2772.
As to Celotex, the commissioner stated:
It is clear from the testimony that plaintiff [Beth Israel] knew of leaks in the building. However, there was no basis for the plaintiff to have knowledge either actual or constructive that the cause of the leaks may be the roof. The plaintiff had been advised by Perez and Bartley that the problem was improper maintenance.
Celotex replaced a portion of the roof, the equipment well roof, in 1975. Celotex was informed of other leaks. However, Celotex advised Beth Israel that the leaks were caused by improper maintenance. The evidence is overwhelming that Celotex knew of problems with its two ply roofing system. In fact, the Bond Ply roof system was removed from the market by Celotex shortly after the Beth Israel roof was installed. Celotex made no effort to disclose this information to plaintiff. Prescription cannot commence to run in favor of Celotex under these circumstances.
The last statement is error. Prescription runs even as to a bad faith seller or manufacturer. However, the one year begins at the time of discovery of the vice by the buyer, and discovery must be proven by Celotex by a preponderance of the evidence.
The reasons for judgment do not make a determination as to when Beth Israel discovered the cause of the leaks. The court noted "considerable discussion" as to when Beth Israel "obtained actual knowledge of the defects," but it erroneously concluded that it did not have to address that issue. The court found that the first amended petition (January 7, 1980) stated a claim in redhibition and the third amended petition with redhibition allegations reverted back to filing of the original petition (January 17, 1979). However, reverting to 1979 or 1980 does not make the redhibition or tort claim timely as to the roof which was placed on the building in 1969.
This Court must determine the date from which prescription began to run. To do so, we will consider the reasonableness of Beth Israel's actions over the years. Israel Trestman, president of the synagogue from 1963-1970, testified that the roof leaked from the beginning. Jacob Kansas, secretary of the synagogue from about 1970-1976, testified that he tried to resolve some of the problems, such as the exterior aggregate paneling cracking, and water pouring in through the walls. A wall of water flowed by the doors and the entrance could not be used. Water gushed from light fixtures. Mr. Kansas stated that Bartley and others consistently told the congregation that some leaks were due to *1074 clogged drains. He personally went on the roof during rain and observed very few leaves and a drain that was not clogged.
Mr. Kansas contacted Perez and Bartley over the years, but the leaks continued. He also dealt with Mr. Brooks, Celotex's representative, who only agreed to pay for the roof and flashing over the kitchen because the bond did not include drains or scuppers. Celotex paid $3,500 of the $5,450 bill. The original roofing contractor increased the flashings in 1974 or 1975 and Bartley's subcontractors made repairs, but the leaks continued.
Maurice Handleman, co-chairman of Beth Israel's building committee, testified that within a year after moving into the synagogue the first leaks occurred. Samuel Shear, head of the congregation's house committee and later president, testified to numerous roof leaks over the years. Mr. Shear first examined the roof in 1976 when he became chairman and inspected it many times. Eventually representatives of Perez (including Mr. Palm) met with the congregation which decided that Perez should submit a proposal for necessary repairs. That 1978 proposal by Perez (cost $1,000) focused on leaks in the main sanctuary. Because the plan was not a solution to the entire problem, the congregation rejected it in the latter part of 1978. On March 14, 1979 Mr. Samuels, synagogue president, Mr. Bartley, Mr. Shear, two photographers, and Beth Israel's attorney toured the entire building and photographs were taken. The problems continued.
According to Mr. Shear, the congregation decided to hire another architect for the repair project and began the selection process in 1979. Most architects did not want to become involved in litigation. The congregation chose Turchi-Cusick-Drew Architects Inc. in 1980 and a contract was signed in 1981. TCD's recommendation for a roofing consultant, CCI, consumed additional time and contract specifications and the invitation to bid were not confected until March 30, 1981. The re-roofing contracts were not finalized until July 16, 1982 and June 29, 1983.
John Bartley, president of Bartley, Inc., testified that contract changes on the bond ply roof and bond coat panel were made without a change order because costs were not changed. He acknowledged there was severe water seepage through the aggregate panel and numerous roof leaks. He did not make an inspection of the building until November 6, 1986.
Robert Bartley, executive vice-president of Bartley, Inc., wrote to the roofer in 1971 about blisters in the roof. Leaks had been reported. In May, 1973 he had a superintendent use a water hose to check the leaks. He found some windows with leaks, plus leaks around the kitchen fan and air intake areas. Bartley had caulking applied, but he felt there was no problem with the building or its specifications. Bartley made an inspection March 14, 1979 along with others. He said there was a lot of roofing debris stacked on two of the roofs, with weeds and grass growing out of the debris on one roof and deteriorated flashing. Bartley found the chillers were rusted as if they had been in a salt marsh for years. He said there had been no maintenance.
August Perez, Jr. testified that a representative of Celotex convinced him that Celotex's new two ply system was the future for roofs. Celotex agreed to bond the two ply roof although it would not have bonded a four ply roof because of the size of the building. Mr. Perez said the first leak reported to him was in the lobby area and he found the drain on the roof was clogged due to debris. Mr. Perez recommended a screen for the drain. Jacob Kansas (of the congregation) pointed out leaks in the clerestory area, some from the dome, and window leaks. Later there was water leakage four feet high around the building through the bond coat strip. In 1975 Mr. Perez turned over the project and its problems to his son.
Ronald Pilgrim, Perez's field representative, testified that in 1972 he investigated water leakage and deterioration of exposed exterior aggregate plaster. During the August 18, 1972 inspection Mr. Pilgrim clearly remembered standing water on the *1075 roof and believed the problem was a drain clogged with leaves and debris. Perez subsequently informed Beth Israel that the drains had to be kept clean and the building properly maintained. On another inspection Mr. Pilgrim again found the drains clogged and standing water on the roof. In 1975 Chassanoil, the original roofer, reflashed the entire perimeter of the clerestory. Mr. Pilgrim's work on the project ended in 1975.
C.H. Palm, a Perez architect, testified he toured the synagogue on June 6, 1978 and found a failure of the exposed aggregate panel on all sides of the building. There was water damage on the acoustical ceilings and one area of the roof had ponding water. On August 1, 1978 Mr. Palm for Perez submitted a bid for repairs, which was not accepted.
Nano Turchi, Turchi-Cusick-Drew architect, testified that he was contacted by a member of the congregation about repairs and he later inspected the building in the spring of 1980. He insisted on using CCI as a roofing consultant. Turchi's first letter to Beth Israel on June 16, 1980 recommended re-roofing the sanctuary wing and a single story portion of the sanctuary and education wings. He met with CCI's experts in July, 1980 and a contract with Beth Israel was signed June 18, 1981. The invitation to bid and contract specifications were dated March 30, 1982 with an April 13, 1982 addenda.
Robert Drew, architect with Turchi-Cusick-Drew, testified that he and his partner, Nano Turchi, toured the building in 1980. Around December 22, 1982 Mr. Drew was called to the site by the job superintendent and he saw that the roof deck over the entire main building was saturated with water. He said his firm contacted CCI which made an analysis of how the roof could be repaired. Mr. Drew used that analysis and recommendations to prepare contracts with the roofing company.
James Davis, vice-president of Sizeler Construction Company, testified that his company bid on the re-roofing project. He and Louis Taverna inspected the building. Mr. Davis said there was an intense mildew odor in the building. The sanctuary's ceiling was flaking and had holes and the walls had water seepage. Mr. Davis testified that when they removed the old roof the insulation was very wet and falling apart. He stated that he had never seen that much moisture in insulation which clumped in your hand. He testified his company worked on the outside from September, 1982 until January, 1983. The interior repairs started in July, 1983 and were completed in September, 1983.
Louis Taverna, superintendent of Sizeler Construction Company, stated that in 1982 there was a horrible mildew smell which made the building uninhabitable. He documented breaks in the tar paper on the entire roof and wet insulation board.
Dennis McNeil, Chicago branch manager of CCI and a roofing expert, testified his firm was asked to determine what to do about the roof. CCI's first involvement was in April, 1980. He inspected the roof on June 23, 1981 and found: extensive leak evidence and ceiling damage inside; roof not sloped and problems with the flashing and gravel stop as well as curbs; globules of coal tar formed into the surface of the roof; debris from previous roofing repairs; and a few roof blisters (distentions of the surface of the roof membrane which is caused by a void within the layers of felt).
Later, crews made several probes into the roof and found wet insulation. In his August 11, 1981 report to TCD Mr. McNeil concluded that the roof was in an advanced state of deterioration and had to be replaced. In his report he concluded that the roof system had failed due to the type of membrane used with the insulation and roof deck.
Correspondence over the years verifies that Beth Israel complained about leaks and was told maintenance primarily caused the problems:
Letter dated June 5, 1970 by Robert Bartley to Perez noting roof and wall leaks as punch list items requiring remedy;
Note dated December 30, 1970 by Robert Bartley relative to leak in kitchen;

*1076 Letter dated September 15, 1971 by Robert Bartley acknowledging leaks in the passage to the kitchen and kitchen area;
Letter dated September 30, 1971 by Robert Bartley noting roof blisters;
Letter dated March 15, 1972 by Robert Bartley to the original roofer Edward Chassanoil stating that there were recent severe leaks;
Handwritten notes dated July 10, 1972 by Robert Bartley noting various leaks after heavy rains;
Letter dated August 9, 1972 by Beth Israel to Perez about the water leaks reported weeks earlier to Bartley but were not remedied;
Handwritten report of inspection on April 19, 1973 noting various leaks but again continually stating that maintenance would have solved many of them;
Letter dated May 4, 1973 by Robert Bartley to Celotex referencing Coleman Curtis' report which noted roof blisters but stated they were not defects to be repaired under the bond;
Letter dated May 18, 1973 by Robert Bartley to Ellis Erwin declaring that the major leaks in the lobby are unquestionably due to building maintenance;
Inspection report dated August 1, 1975 by Mr. Brooks of Celotex as to the leaking problem in the kitchen noting blisters as well as other problems and recommending replacing that roof;
Roof complaint notice dated April 1, 1976 by Mr. Brooks noting two leaks which he felt were not covered under the bond and noting that there was debris and maintenance was not being done properly;
Memorandum dated March 14, 1979 relating to inspection again listing numerous leaks as well as stating that maintenance was not being properly done.
Celotex correctly argues that testimony by Jacob Kansas, Israel Trestman, and Samuel Shear and the correspondence shows that the building leaked soon after installation; however, that testimony is not the determining factor. The fact that Ellis Irwin, attorney for Beth Israel, wrote to Bartley on March 27, 1973 and advised of "certain defects in the roof and building which become evident during rainy weather" does not constitute knowledge by Beth Israel which would warrant knowledge of a defect. An investigation of the leaks followed on April 19, 1973 by Robert Bartley, August Perez, Jr. and others. On May 18, 1973 Robert Bartley stated in pertinent part:
The major leaks at the Lobby are unquestionably due to the fact that those responsible for building maintenance will not keep the roof drain strainer clean of leaves. The water builds up and flows over the protective flashing and down into the building....
The building shows no evidence of any maintenance since completion with regard to caulking, exterior painting and sealing.... (Had certain of this work been performed undoubtedly the current leak problems would not have developed.)
* * * * * *
In connection with the roofing there are two or three `blisters'. The Celotex/Barrett Twenty Year Roofing Bond .... may or may not provide for the repairs to these areas. On behalf of the Congregation we have brought the matter to the attention of the Celotex Corp. but at this time we do not have that firm's final position....
A Celotex interoffice communication by inspector Coleman Curtis (May 2, 1973) authorized repairs to only one fishmouth in the gravel guard, and stated:
The other points of water entry were around the raised section of main roof where the curbs were so low that water will build up and run over. Another section is apparently where the brick and the panels near the top meet. Apparently some water is coming in the wall but not through the roof. There were a couple of blisters in the area of the mechanical equipment but we repair only leaks. In this same area there was a large amount of ponded water which provisions should be made to eliminate. These areas I have mentioned are not in the bonding company's responsibility.
*1077 Beth Israel had Edward Chassanoil, the original roofer, raise the flashings in 1975, but leaks continued. Alvin Cotlar, president of Beth Israel, noted in a July 27, 1975 letter that the roof in the kitchen was defective and dangerous.
A memo by Tom Brooks, Celotex's representative, (September 30, 1975) recommended that Celotex replace the roof membrane and flashings over the kitchen. The cost of $3,500 to Celotex was set out in a December 3, 1975 letter with Beth Israel paying for insulation and vapor barrier ($1,950). Leaks continued. On March 29, 1976 Mr. Brooks noted in a Celotex roof complaint notice and repair request that water was entering over low flashings under a doorway, that maintenance was the problem (pitch pans needed filling and debris should be removed), and that the leaks were not covered by the bond.
By June, 1978 Beth Israel had retained additional legal counsel. Perez prepared a plan of repair on August 4, 1978. The plan did not include the roof's membrane problems and was rejected by Beth Israel at the end of 1978. In 1980 Beth Israel signed a contract with TCD to investigate the problems. TCD consulted CCI and Dennis McNeil. Mr. McNeil's 1981 report said the roof failed. Beth Israel contracted with TCD in 1981 to make roof repairs which were made by a subcontractor in 1982; other interior work was completed in 1983.
Beth Israel properly argues that it was aware of water leaks from the time the building was complete and repeatedly contacted Bartley, Perez and Celotex for years; however, it never focused on the roof as the culprit because Celotex continually denied any roof problem. Bartley and Perez repeatedly related the leaks to a lack of maintenance. Beth Israel did not learn that the roof had failed until CCI's report in 1981.
Beth Israel filed suit for breach of contract against Bartley and Perez on January 17, 1979 requesting $66,160.00. On January 7, 1980 in a supplemental petition Celotex among others was made a defendant and the $4,340.00 roof bond was noted. Paragraph 9 stated: "A portion of the substandard and defective work ... involves the built-up roof system ...; said roofing system has failed to function in that the building is experiencing roof leaks at many points...." In paragraph 10 Beth Israel noted that the cost of the remedial work exceeded the penal amount and requested that Celotex and Aetna be cast in judgment solidarily with the other defendants to the extent of the bond. In its second supplemental petition filed May 30, 1980 Beth Israel amended several paragraphs as to the original defective work and the ineffectual attempts to remedy the building's problems and prayed for $500,000 against all defendants in solido. In paragraph 23 of its third supplemental petition filed November 22, 1983 Beth Israel stated that the defendants including Celotex knew or should have known the building was going to leak (filed after CCI's report).
We are amply satisfied that Beth Israel withheld legal action for years because of consistent misleading information from Celotex. Also, Bartley and Perez submitted repeated reports that assured Beth Israel that maintenance was the problem. It was not until CCI's 1981 report when there was specific information to support a claim against Celotex. By that time suit had been filed and Celotex was a defendant.
The commissioner and trial court properly concluded that Beth Israel's claim in redhibition had not prescribed.

DAMAGES
The commissioner set the award against Celotex at $218,816.00 which included $123,816.00 for exterior damages, $50,000.00 for interior damages, $30,000.00 for professional fees and $15,000.00 attorney's fees. The trial court reduced the award against Celotex to $206,476.00.
Celotex claims damages were not proven with specificity and points to the commissioner's reasons: "It is difficult at best to delineate which items of interior and exterior damages were the result of Perez's design defects and Celotex's defective roof." The commissioner considered the extensive evidence on damages and decided to cast *1078 Celotex for $123,816.00 of the exterior and $50,000.00 for the interior damages. Perez and Celotex excepted to the findings of the commissioner and argued that the award was not supported by the evidence, or that Beth Israel failed to prove damages with sufficient particularity.
The trial court looked closely at the awards and found some merit to arguments against certain items. The court concluded "that the Commissioner's reasons sufficiently delineates [sic] the damages proved, and further believes that to require the Commissioner to painstakenly rule on each line item of several respective contracts, would not only be overly burdensome, but equally unnecessary." The court reduced the Perez award by $7,224.31, and the amount of certain items in the repair contract (construction of "Succoth Court" and stage as well as a walkover on the roof and replacement of glass) which were not due to defects in design or construction.
As to Celotex the court deleted $8,000 from the award which reflected materials used to raise the curbs on the roof, to cover additional insulation, and to construct a roof walkway, all of which were not related to the defective roof. In the judgment after granting motions for a new trial, the court subtracted the amount of the Aetna roofing bond, $4,340, (subject to the credit of $3,500 already paid) from the award against Celotex.
Beth Israel introduced its contract with TCD listing amounts necessary for work to be done by subcontractors for a new roof and repairs to the interior of the building as well as actual statements and invoices. Mr. Drew of TCD went through the expenditures to weed out amounts that did not relate to remedying defects or repairing water damaged interiors. Hundreds of exhibits which included contracts, proposals, and invoices were admitted.
TCD's application and certificate for payment indicated Beth Israel paid $216,064.48 for exterior repairs. In post trial memorandum Beth Israel summarized the two major items of cost to repair the exterior of the building: the roof and plaster aggregate panel which cost $134,200.00 and $40,800.00 respectively. The cost of interior work was listed as $109,625.93 and work on the clerestory ran $60,000.00. Beth Israel subtracted certain figures from the totals which covered additions and improvements not to be attributed to defects or problems in the original construction. Beth Israel also paid for the professional services of TCD and CCI as well as for construction documents. According to Beth Israel it spent $376,376.38 in repairing its building.
Beth Israel was entitled to recover amounts expended for repair of the roof and for repairing water damage to the interior of the building. See Busenlener v. Peck, 316 So.2d 27 (La.App. 1st Cir.1975). The measure of recovery is usually the cost of repairs necessary to convert the unsound structure into a sound building. Brown v. Dauzat, 157 So.2d 570 (La.App. 3rd Cir.1963).
The commissioner and the trial court carefully considered the extensive testimony and voluminous evidence to determine appropriate awards. We are satisfied that the damages were proven with specificity.

CREDIT FOR BENEFICIAL USE
Celotex argues that it is entitled to a reduction of the judgment because Beth Israel had beneficial use of the building. The roof was completed October 1, 1969 and the replacement roof was started in September, 1982. Celotex claims a credit for the thirteen years of use by Beth Israel.
The trial court focused on the part of the record that is "replete with testimony that would support" that Celotex was in bad faith by claiming that the roof was not defective despite knowledge to the contrary. However, such bad faith does not determine whether a credit for use of the building is proper. Whether the vendor is in good and/or bad faith is not a determining factor. Alexander v. Burroughs Corporation, 359 So.2d 607 (La.1978).
The trial court correctly cited Atkinson v. Total Computer Systems, Inc., 492 So.2d 121 (La.App. 1st Cir.) writ denied 496 So.2d 356 (La.1986), which held that a *1079 seller/manufacturer is not entitled to a credit for use of an item when the benefits of use are outweighed by the inconvenience of the redhibitory item. When a building has been a constant inconvenience which the user has never fully utilized, no compensation for beneficial use is warranted. Dunn v. Redman Homes, Inc., 411 So.2d 722 (La.App. 3rd Cir.1982).
Members of Beth Israel, Jacob Kansas, Maurice Handelman, Israel Trestman, and Samuel Shear, testified that water poured in during services, that services had to be moved into different areas of the synagogue, and that there was general inconvenience and constant worry due to the defects. Mr. Taverna and Mr. Davis of Sizeler Construction Company testified that the mildew smell in 1981 was so intense that they could not believe services could be conducted.
The trial court properly concluded that Celotex was not entitled to any credit because any benefits from use of the leaking roof were far outweighed by inconveniences from the roof's defects.

LEGAL INTEREST
Celotex correctly argues that the trial court erred when it awarded legal interest from the date of judicial demand on the entire award which included $15,000 in attorney's fees. Beth Israel concedes that was error.
Attorney's fees are not ascertainable until awarded by the court and interest on such fees begins from the date of the award. Alexander v. Burroughs Corporation, 359 So.2d at 607; Leflore v. Anderson, 537 So.2d 215 (La.App. 4th Cir. 1988).
The judgment is amended to provide that interest on the $15,000 attorney's fees shall run from the date of the trial court's judgment. As amended the judgment is affirmed.
AMENDED;
AFFIRMED AS AMENDED.