663 So.2d 801 (1995)
NATIONAL TEA COMPANY
v.
PLYMOUTH RUBBER COMPANY, INC.
No. 95-CA-254.
Court of Appeal of Louisiana, Fifth Circuit.
October 18, 1995.
*803 James K. Irvin, Milling, Benson, Woodward, Hillyer, Pierson & Miller, New Orleans, for Plaintiff/Appellee, National Tea Company.
A. Morgan Brian, Jr., New Orleans and Lloyd N. Shields, Smith, Martin, Schneider, Shields & Mott, New Orleans, for Defendants/Appellants, Anning-Johnson Company and Insurance Company.
Andrew I. Brown, Henican & Brown, New Orleans, for Defendant/Appellee, Plymouth Rubber Company, Inc.
Before BOWES, GRISBAUM and DUFRESNE, JJ.
BOWES, Judge.
Plaintiff, National Tea Company, filed suit in the Twenty-Fourth Judicial District Court for the Parish of Jefferson, No. 375-840, for breach of warranty as the result of an alleged defective roof. Named as defendants were Anning-Johnson Company (hereinafter "Anning"), the contractor who installed the roof; Insurance Company of North America (hereinafter "INA"), Anning's insurer; Plymouth Rubber Company (hereinafter "Plymouth"), supplier of the roofing materials; and Century Insurance Company, Plymouth's insurer.
In addition, both Anning and Plymouth filed cross-claims against each other. Prior to the completion of trial on the merits, Plymouth settled its claims with National. After the trial on the merits, the court rendered judgment in favor of National, and against Anning and INA. Anning was given credit for the amounts received by National in the various settlements entered into which is an important question in this appeal. Both Anning and INA, and National have appealed the judgment of the trial court.
For the following reasons, we affirm in part, amend and affirm in part, and reverse in part.

ANALYSIS
Louisiana appellate jurisdiction extends to questions of law and fact in civil cases. La. Const. of 1974, art. 5, §§ 5 and 10.
The applicable standard of review of a trial court's findings of fact was set forth by the Louisiana Supreme Court in Ambrose v. New Orleans Police Department Ambulance Service, 93-3099, 93-3110, 93-3112 (La. 7/5/94), 639 So.2d 216, 220:
In Arceneaux v. Domingue, 365 So.2d 1330 (La.1978), this Court held that the court of appeal should not upset the factual findings of a trial court absent manifest error or unless clearly wrong. A proper review, therefore, cannot be "completed by reading so much of the record as will reveal a reasonable factual basis for the finding in the trial court; there must be a further determination that the record established that the finding is not clearly wrong." Id. at 1333. More recently, regarding this constitutional appellate review of fact in civil cases, La. Const. art. 5, Sec. 10, we have had occasion to say in Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), a case which involved the review of damages, that "the discretion vested in the trier of fact is `great,' and even vast," and in Stobart v. State, 617 So.2d 880, 882-83 (La.1993), which involved the standard of review of findings of fact, a "court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of `manifest error' or unless it is `clearly wrong,'" and "where two permissible views of the evidence exists, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong." Id.

The proper standard for appellate review of the question(s) of law is simply whether the court's interpretive decision is legally correct. Phoenix Assur. Co. v. Shell Oil Co., 611 So.2d 709 (La.App. 4 Cir.1992). *804 If the trial court's decision was based on its erroneous interpretation or application of law, rather than a valid exercise of discretion, such an incorrect decision is not entitled to deference by the reviewing court. Kem Search, Inc., v. Sheffield, 434 So.2d 1067 (La.1983).
In the matter before us, the learned and well experienced trial judge made extensive and well written findings of fact in his reasons for judgment and, after a careful review of the entire record before us, we find that the trial court did not commit manifest error in his conclusions of fact.
For the sake of convenience, brevity and clarity, a portion of these facts are now recited.

FACTS
As extracted from the trial judge's reasons for judgment) NOTE: All emphasis and all matters in brackets have been added by the writer of this opinion.
National Tea Company ("National"), plaintiff herein, is the owner of a huge warehouse located at 5110 Jefferson Highway, Harahan, Louisiana.
In early 1983 it was decided to replace the existing roof which had been built in 1961. Said roof is of the type known as a "Built Up Roof" ("BUR") consisting of a corrugated metal deck filled with light weight insulating concrete, covered by insulation board, three plys of felt and a hot asphalt surface imbedded with pea gravel. The roof measured over 250,000 square feet or approximately six and one half acres.
National's architects prepared specifications which called for the new roof to be installed over the existing BUR and consisting of a type known as a single-ply Ethylene Propylene Diene Monomer ("EPDM") roof membrane system manufactured by Carlisle Symtec Systems ("Carlisle"). Bids were sent out and Anning-Johnson Company, ("Anning") defendant herein, received a bid and submitted a proposal.
National was interested in Anning's bid but was concerned with the cost. Anning then recommended a less expensive system produced by Plymouth Rubber Company ("Plymouth"). Upon the revised bid by Anning, with Plymouth substituted for Carlisle, being accepted by National, a contract was signed for $418,000.00.
After some investigation and the establishment of certain conditions, Plymouth agreed to provide a ten year warranty. The primary conditions were that the work had to be done in compliance with Plymouth's specifications and inspection upon completion. In early 1984 Anning began its work.
Anning's contract called for two types of installations. Above the cold storage area on the west end of the building the EPDM was glued directly to fiber board insulation installed over the BUR. This covered approximately one-third of the roof.
The balance [remaining two thirds] of the roof, or grocery area, was secured by the use of narrow strips of plastic (expanded polystyrene) called battens. These were secured with screw type fasteners which were driven through the BUR and the metal corrugated deck. One inch below said deck was the required penetration of said screws.
Several leaks were noticed by National and repaired by Anning during construction. These were mainly coming through the screw holes in the portion completed in the batten-screwed area.
On May 20, 1984 there was a very hard rain beginning before sunlight. National's superintendent, Lawrence Robert, found water pouring through the screw holes in the batten-secured portion and through drain holes which had been cut by Sam Wallace and Company, another contractor. At this time Anning had completed about one half of the batten secured part of the roof.
According to the testimony of Mr. Robert and Mr. Art Smith, National's distribution manager, the water was coming in only from the batten-screwed area and the roof drains but none had entered in the cold storage area or east of the cut off area except for the drains. The cut-off area is where the contractor had stopped his most *805 recent work and which he was obligated to seal off and prevent leakage with hot mopped asphalt.
Anning completed the roof in December, 1984. A punch list of discrepancies was reported [by Anning] to be complied with on December 28, 1984.
Within a short period of time after the completion new leaks were noted and Anning repaired them. The situation worsened and every substantial rain produced new leaks in different parts of the warehouse. This caused National to actively pursue measures to prevent losses. Products were moved around and the leaks were diverted when possible.
By February of 1985 Anning had ceased responding to National's calls, according to Mr. Smith [National's distribution manager]. Written demands were met with a denial of responsibility.
In late 1986 Plymouth responded to National's calls regarding their warranty by sending a roofer, Charles Reinhardt to inspect the roof. He advised Plymouth that the roof was in need of immediate repair.
National then requested that Reinhardt repair the roof which he did for $27,465.00 [paid by National].
In September of 1987 Plymouth's and Anning's representatives met with National's attorney. Plymouth agreed to reimburse National for Reinhardt's work. Anning's representative again denied responsibility.
In December of 1987 Plymouth called upon another roofing company, Powers Roofing Company ("PRC") to inspect the roof. After inspection by PRC, Plymouth authorized PRC to make repairs which it did. These repairs held up but new leaks continued to occur in other areas.
In early 1990 Powers recommended that the roof [constructed by Anning] be replaced.
Bids were obtained and PRC was awarded the contract for $585,000.00. PRC removed the existing system and replaced it with a [roofing] system [manufactured by Carlisle Syntec Systems].
The only other major differences [beside the manufacturer of the roofing system] in the Anning and PRC contracts were the use of toggle bolts to fasten one-half inch wood fiber board to the corrugated metal deck and lay the EPDM on top of the fiber board and to use screws to fasten the isocyanurate insulation to the light weight concrete insulation in the channels of the corrugated metal deck without penetrating the metal.
With added change orders the total cost of the PRC contract came to $604,000.00.
In January of 1989, National filed this suit naming Anning, Commercial Union Insurance Company ("CUC") and Plymouth as defendants.
Anning's performance bond insurer, Insurance Company of America ("INA"), was joined as a defendant by National in 1990. By other supplemental and amending petitions of National and third party petitions by Plymouth, Uniroyal, the manufacturer of the adhesive used by Anning, and seven different liability or excess insurers of Plymouth were brought into this suit. Other cross-claims and counter claims were filed by and between those new defendants.
In 1986 National Filed (sic) suit in matter # 326-957 [in the Twenty-Fourth Judicial District for the Parish of Jefferson] against four defendants, Anning, its liability insurer, CU[C], Sam Wallace and Company ("Wallace"), and its liability insurer, Fireman's Fund Insurance Company ("Fireman's"). In this suit, only liability for all damages sustained by National in consequence of the May 20, 1984 rainstorm was sought. This case was settled prior to trial by all parties by payment of a total of $50,000.00 to National.

Before trial of the instant suit CU[C] paid National another $10,000.00 to be released, together with Anning, of all liability for consequential and incidental damages and any damages suffered below the EPDM system installed by Anning.
Four of Plymouth's insurers paid National a total of $275,000.00 for a release of all claims against them and Plymouth. This was on June 24, 1993.

*806 National has received $335,000.00 to date.

The remaining defendants are Anning and INA, who were sued by National, and Plymouth, who with Anning are third party plaintiffs and defendants, respectively, against each other.
[All emphasis added].
The trial judge then stated that
The trial of this case became a contest between Plymouth and Anning, each attempting to blame the other.
Anning's defense was directed against the neoprene adhesive furnished by Plymouth. Evidence was produced to show that neoprene had a propensity to degrade and lose its adhesive qualities when contacted by water. Plymouth has insisted that any neoprene failure was caused by water being allowed to contact the neoprene before it was cured or by failing to properly apply the adhesive according to Plymouth's manual and specifications.

THE JUDGMENT
After a discussion of the evidence presented by the parties, the trial judge stated "The Court concludes that the neoprene adhesive [supplied by Plymouth] was not defective and that the Anning work was." [Emphasis supplied].
The trial judge then ruled on the issue of damages as follows:
The Court assesses the cost of replacement of the roof at $604,000.00, the amount charged by PRC. Additionally, $27,465.00 were (sic) paid to Reinhardt in a good faith effort to repair the leaks and is recoverable by plaintiff. Guillot v. Moore, 131 So.2d 533 (1961).
This totals $631,465.00. However, Anning is entitled to a credit received in prior settlements of $335,000.00 for a net total of $296,465.00.

No actual showing of any specific amount contributed by Plymouth was presented to the Court.
[Emphasis supplied].
Anning and INA have appealed from the decision of the trial court and present four allegation of error for our review. National also filed a motion for appeal from the trial court's decision.

APPEAL OF ANNING AND INA

Assignment of Error Number One
The Court erred by awarding damages to National for claims previously settled by the 1987 settlement release.
In 1987, as a result of the 1986 suit [being No. 326-957 of the Twenty-Fourth Judicial District Court], National and Anning-Johnson entered into a settlement agreement for the damages which occurred during the 1984 rain storm. Anning alleges that water absorbed by the roof's substrate during that rain storm led to the roof's failure. Anning then alleges that, by entering into the compromise agreement for all damages arising out of the 1984 rainstorm, National has released Anning from all further liability. National contends that the compromise agreement intended to cover and did cover only consequential damages arising from the 1984 storm and not the subsequent damages caused by Anning's defective workmanship, that being the subsequent repairs to the roof and the ultimate replacement of the roof.
The trial court agreed with the arguments of National, and, in reasons for judgment, stated that:
Anning claims that is was released from any liability by the release granted by National in settlement of the 1986 law suit. The Court finds that the release only applied to the consequential damage sustained below the roof during the storm. National did not release Anning from the claim set out in the instant suit.

[Emphasis supplied].
La. C.C. art. 3071 provides;
A transaction or compromise is an agreement between two or more persons, who, for preventing or putting an end to a lawsuit, adjust their differences by mutual consent, in the manner which they agree on, and which every one of them prefers to the hope of gaining, balanced by the danger of losing.

*807 This contract must be either reduced into writing or recited in open court and capable of being transcribed from the record of the proceeding. The agreement recited in open court confers upon each of them the right of judicially enforcing its performance, although its substance may thereafter be written in a more convenient form.
La. C.C. art. 3073 provides:
Transactions regulate only the differences which appear clearly to be comprehended in them by the intention of the parties, whether it be explained in a general or particular manner, unless it be the necessary consequence of what is expressed; and they do not extend to differences which the parties never intended to include in them.
The renunciation, which is made therein to all rights, claims and pretensions, extends only to what relates to the differences on which the transaction arises.
The Release agreement at issue provides:
Now, for and in consideration of said respective contributions and the full payment, NATIONAL and PROTECTION hereby accept said total sum of money in complete compromise settlement and full and final payment and satisfaction of, and hereby release and forever discharge said COMMERCIAL, ANNING, FIREMAN'S, and WALLACE, and each of those last four parties likewise hereby releases and forever discharges each of the other of said parties, as well as each one's respective owners, successors, assigns, employees, agents, insurers, reinsurers, sureties, and all other persons, firms and corporations, from, any and all claims, demands, actions, causes of action, suits, appeals, damages (liquidated or otherwise), property damages, consequential damages, loss of use, business interruption, losses, interest, contract sums, subcontract sums, bond sums, expenses, costs, attorney fees and penalties (whether statutory or otherwise), and all other amounts of whatever kind or character, which in any way arise out of and/or are connected with and/or related to any and all acts, omissions, torts, breaches of contract and/or quasi-contract, strict liabilities, contributions and/or indemnities (conventional and/or legal), and/or any other kind of liability whatsoever, of any or all of them, in any way connected with, arising out of, and/or related to that certain rain casualty which occurred on or about May 20, 1984, to the roof renovation project as performed through that date, pursuant to ANNING's and WALLACE's respective contracts for the reroofing of, and the installation of new roof drains on NATIONAL's warehouse located at 5110 Jefferson Highway in the Town of Harahan in Jefferson Parish, Louisiana ("The Casualty"), and all damages (exterior, interior, and consequential) caused thereby and/or resulting therefrom, all as asserted in the lawsuit identified hereinafter, but expressly excluding any damages or breach of contract claims solely arising from or caused by ANNING's completion of its reroofing work and contract subsequent to May 20, 1984 and not related to, arising from, or caused by The Casualty.
[Emphasis supplied].
From the terms of the agreement, it is clear that, for Anning to be released from liability, the failure of the roof must have been caused by the May 1984 rainstorm. Indeed, at the trial of this matter, Anning alleged that water became trapped in the roof during the rainstorm, and migrated, and that this was the cause of the seam failure over the next few years. However, the trial court, after hearing all the testimony in this case, concluded that "The trapped, migrating water defense is not appropriate." Our careful review of this voluminous record and the language of the compromise agreement convinces us that the trial judge was correct in his conclusion and he did not commit manifest error in this finding of fact.
Accordingly, we, too, find that the failure of the roof was not caused by the rainstorm occurring on May 20, 1984 and that the settlement agreement between Anning and National did not release Anning from liability for the failure of the roof.
In addition, we note that, obviously, pursuant to Louisiana statute and jurisprudence, a settlement agreement extends only to those *808 matters intended to be settled by the parties. La. C.C. art. 3073; Brown v. Drillers, Inc., 93-1019 (La. 1/14/94) 630 So.2d 741.
The language in the compromise agreement at issue here expressly reserves to National the right to proceed against Anning for the completion of the roof subsequent to the 1984 rainstorm. This reservation would be rendered meaningless if, as Anning contends, National had intended to settle its claim, not only for consequential damages, but also for the defective roof itself. We, therefore, hold that the trial court committed no error in ruling that the release agreement did not bar this action for damages incurred as a result of Anning's breach of contract of warranty in installing the roof at issue herein.

Assignment of Error Number Two
Did the trial court err in awarding replacement value of the roof when the replacement was of better quality? Also, did the trial court err in failing to award credit for use of the defective roof?
For the breach of a building contract under La. C.C. art. 2769, the appropriate measure of damages is the cost of repairing any defects or of completing the roof. Where the replacement of the roof is necessary to cure the defects, the cost of replacing the roof is a proper element of damages. Guy Williams Realty v. Shamrock Const., 564 So.2d 689 (La.App. 5 Cir.1990), writ denied, 569 So.2d 982 (La.1990).
In this case, the trial court awarded to National the entire $604,000.00 charged by Powers Roofing Company. Included in this price was the cost of removing the defective roof installed by Anning and replacing it with a new roof. The evidence presented in this case clearly establishes that replacement of the roof was necessary. In order to replace the roof, the defective roof had to be first removed. Accordingly, the trial court did nothing more than assess as damages the cost of replacing the defective roof, which was the appropriate measure of damages in this case. Anning argues that the replacement roof was "better" than the roof it installed in 1984 and, therefore, the trial court should not have awarded the "difference" between the roof actually installed and the roof equivalent to that originally contracted for in 1984. However, Anning fails to present evidence to show that the roof was better, or to show what the equivalent cost of a roof like the one it originally installed would be. Accordingly, we find no manifest error in the trial court's award of the entire replacement value of the roof as damages.
Anning also argues that the trial court failed to give credit for the years of use that National received from the roof it installed in 1984. However, evidence established that the roof leaked from the very beginning and that the many attempts made to repair the roof did not alleviate the problem because that as soon as one leak was repaired, another leak would occur. In this case, National never received the use of the roof that it paid for, a roof that did not leak. National has had to suffer with a leaky roof, in a warehouse which contained foodstuffs for resale, causing aggravation and damages on a continuous basis since the roof was first installed (and even since construction was first begun).
Accordingly, we cannot say that the trial court abused its discretion in failing to give Anning credit for the use of the roof. We find no manifest error here. Compare Beth Israel v. Bartley, Inc., 579 So.2d 1066 (La. App. 4 Cir.1991), writ denied, 587 So.2d 696 (La.1991); Five M. Palmer Tr. v. Clover Contr., 513 So.2d 364 (La.App. 4 Cir.1987).

Assignment of Error Number Three
Did the trial court err in awarding legal interest from date of judicial demand instead of from date of judgment?
The Louisiana Supreme Court, in the recent case of Knecht v. Board of Trustees, 591 So.2d 690 (La.1991) held that, in a breach of contract case, judicial interest is due on the date that the contract has been breached:
When the obligor who owes an obligation to do has actively violated the contract, damages, including interest, are due from the moment of the breach, and the obligee is not required to put the obligor in default to be entitled to his action. La.Civ.Code art. 1932 (1870); Alexander v. Burroughs *809 Corp., 359 So.2d 607 (La.1978); see Mini-Togs Products, Inc. v. Wallace, 513 So.2d 867 La.App. 2d Cir.), writ den. 515 So.2d 447, 451 (1987).
In this case, it became obvious, even prior to date of judicial demand, that Anning had violated its contract and breached its warranty with National, in that the testimony at trial established that Plymouth, the supplier of the materials, attempted to repair the roof and honor the warranty, while Anning continually denied liability. Thus, Anning was clearly in breach of the contract of warranty at the time the suit was filed. Accordingly, the trial court did not err in awarding judicial interest from date of judicial demand instead of from date of judgment. See also Rivnor Properties v. Herbert O'Donnell, Inc., 92-1103 (La.App. 5 Cir. 1/12/94), 633 So.2d 735, writ denied, 94-1293 and 94-1305 (La. 1994), 643 So.2d 147.

Assignment of Error Number Four
Appellants urge that INA, Anning's surety, should be dismissed on the basis of prescription.
In brief, Anning and INA argue that "Pursuant to the express two-year suit limitation period contained in INA's conventional (non-statutory) performance bond, INA should be dismissed from this case because the enforceability of the bond has prescribed.
The contract between Anning and National provided that "performance bond will be provided by Anning-Johnson at no cost to the owner." Pursuant to the contract, Anning obtained a performance bond on a standard American Institute of Architects form A311, which named INA as the surety, and which provided that "Any suit under this bond must be instituted before the expiration of two (2) years from the date on which final payment under the Contract falls due."
Final payment was made by National to Anning-Johnson in January of 1985. This suit was instituted on February 3, 1989, some four years later. By supplemental petition filed on September 17, 1990, Anning named INA as a party defendant and asserted a claim against them as the surety on the performance bond. INA filed an exception of prescription, which was denied by the trial judge. In his reasons for denial, the judge stated that while a prescriptive period can be contractually limited,
..., this right to contractually limit the general prescriptive period applies to the signatories of the contract. National was not a signatory to the bond. Thus, the applicable prescriptive period in the instant case is ten years, as mandated by LSA-CC Article 3500.
INA reurged the exception of prescription at trial; however, the trial judge found that the prior ruling on the exception was the "law of the case" which could not be disturbed.
Suretyship is an accessory contract by which a person binds himself to a creditor to fulfill the obligation of another upon the failure of the latter to do so. La. C.C. art. 3035. Suretyship may be qualified, conditioned or limited in any lawful manner. La. C.C. art. 3040. Thus, a two year prescriptive period in a surety bond is enforceable. J.B. Mouton & Sons v. Alumawall, Inc., 583 So.2d 157 (La.App. 3 Cir.1991); Con-Plex, Div. of U.S. Indus. v. Vicon, Inc., 448 So.2d 191 (La.App. 1 Cir.1984).
The trial court held that the prescriptive period set forth in the bond was inapplicable because National was not a signatory to the bond. We find error in this determination. The contract between National and Anning provided that Anning would supply the performance bond at no cost to National. There is no provision in this contract that the bond supplied must have the same prescriptive period as the contract itself. Thus, Anning complied with the terms of the contract between it and National.
By virtue of the performance bond contract, INA agreed to be Anning's surety to guarantee performance under the contract, for a period of two years after completion of the work. At that time, National was aware that INA would become surety for Anning only for a period of two years; National did not object or complain that the bond was inadequate. From the four corners of the performance bond/contract, it is clear that Anning and INA intended that INA was liable, in the event of Anning's default, for a *810 period of two years after completion of the roof and no more.
The same result was reached in Kiva Const. & Engineering v. Intern. Fid. Ins. Co., 749 F.Supp. 753 (W.D.La.1990), affirmed, 961 F.2d 213 (5 Cir.1992). In considering a performance bond with virtually identical language, the court first said that "Clearly, then, the terms of the performance bond speak only to finishing the job in the event that Kiva failed to do so.... Accordingly, we hold that the ten year contractual warranty is not and has never been supported by IFIC's performance bond." The federal court then determined that the ten year warranty provision in the building contract between the owner and the contractor did not supersede the two year prescriptive period set forth in the suretyship agreement.
We hold, therefore, that the trial court erred in denying and overruling the exception of prescription filed by INA. That exception should have been granted and INA should have been dismissed from this suit.

APPEAL OF NATIONAL
National has filed a cross-appeal in this matter, alleging that the trial court erred in granting to Anning credit against the final judgment award for prior settlements made by National as enunciated below. We find merit in this contention.
National entered into three settlements prior to the decision in this matter. The first settlement was between National and Anning, Sam Wallace and their insurers for specific damages resulting from the May 20, 1984 rainstorm. This agreement, for a total of $50,000.00, settled a separate lawsuit, No. 326-957, filed in the 24th Judicial District Court for the Parish of Jefferson and was intended to release Anning only from consequential damages stemming from the rainstorm and not the damages incurred by the necessity of replacing the defective roof. (See discussion supra).
Accordingly, the trial court erred in granting Anning a credit for this settlement in its award of damages for the defective roof.
The second settlement agreement was between National and Commercial Union Insurance Company, Anson Industries and Anning for $10,000.00 for damages "suffered below the roofing system " and included damages for the interior of the warehouse, furniture, groceries and the like. This agreement dismissed Commercial Union Insurance Company as a party defendant, with prejudice from this lawsuit. Again, it is clear that the settlement did not intend to cover damages for the replacement of the defective roof and the trial court erred in granting Anning a credit against the judgment for the new roof.
The third settlement agreement was between National and Plymouth, entered into during the trial of this matter. That agreement, for $275,000.00, released Plymouth and its insurers from further liability for the defective roof and its replacement. Thus, it appears that this settlement agreement did intend to cover, in part, damages for replacement of the defective roof.
No one is allowed to enrich himself unjustly at the expense of another. La.C.C. art. 2055. Credits are routinely given by courts in order to eliminate this type of double recovery. Texas Bank of Beaumont v. Bozorg, 534 So.2d 498 (La.App. 5 Cir.1988).
National's argument in brief, to the effect that the Louisiana Supreme Court now condones this type of double recovery, is misplaced. To support its position National cites language from a footnote in Taylor v. U.S. Fidelity and Guaranty Ins. Co., 630 So.2d 237, 239 n. 9 (La.1993):
[U]nder the Louisiana statute the plaintiff who settles shrewdly for a large sum with a defendant ultimately found to bear a small percentage of fault reaps the benefit of his negotiations. But the converse is also true, and when the plaintiff accepts in settlement less than the proportionate amount ultimately attributed to the released defendant, he bears the loss and receives less than his total damages. In either event, the non-settling defendants are not liable for the percentage of the total damages proportionate to the fault of the released tortfeasor.
We note, however, that this language deals specifically and exclusively with a tort situation. *811 In a contractual situation we have neither a "tortfeasor" nor an apportioning of a "percentage of fault." Double recovery is sometimes allowed in a tort situation in an attempt to balance the risk taken by a plaintiff in settling with a defendant when that defendant's percentage of fault has not yet been determined. However, the allowance of a double recovery in a contractual situation, in which the damages are fixed, is inappropriate.
We, therefore, see no error in the trial judge's award of a credit to Anning for the amount of the Plymouth settlement.
Accordingly, we find error only in the trial judge's decision awarding a credit to Anning for the amounts received by National in the first two settlement agreements discussed above, as they were for consequential damages, and not for the damages for the replacement of the defective roof, and we amend the judgment of the trial court by deleting these awards, totalling $60,000.00, of credit to Anning.
For the above discussed reasons, the judgment of the trial court, denying and overruling the exception of prescription filed by Insurance Company of America, is reversed and Insurance Company of America is dismissed, with prejudice, from this suit.
The trial court's finding in favor of National and against Anning for damages is affirmed. However, the judgment is amended to the extent that we delete the credit of $60,000.00 given to Anning by the trial judge, and increase the resultant damage award to National by $60,000.00. Therefore, judgment now is rendered against Anning and in favor of National for $356,465.00, together with judicial interest from date of judicial demand.
All costs of this appeal are assessed against defendant, Anning-Johnson.
AFFIRMED IN PART; AMENDED AND AFFIRMED IN PART; AND REVERSED IN PART.