316 So.2d 761 (1975)
Hugh P. LASSEIGNE
v.
EARL K. LONG HOSPITAL et al.
No. 10344.
Court of Appeal of Louisiana, First Circuit.
July 8, 1975.
Rehearing Denied August 26, 1975.
*762 Hugh Lasseigne, pro se.
Walter J. Horrell, Baton Rouge, for appellees.
Before LANDRY, BLANCHE and YELVERTON, JJ.
YELVERTON, Judge.
This case comes to us on a review of a motion for summary judgment granted in a medical malpractice case. The motion for summary judgment is based upon prescription. Following the example set by our brothers of the Third Circuit in Duhon v. Boustany, 239 So.2d 180 (La.App. 3 Cir. 1970) we approve the use of the motion for summary judgment as a proper vehicle for raising the issue of prescription. The trial court granted summary judgment dismissing the petition. We affirm.
The petition names Earl K. Long Hospital and the State of Louisiana as defendants. The petition alleged that on or about May 14, 1971, plaintiff had surgery at the hospital for the removal of left neck muscles, lymph glands, teeth and other tissue. The petition alleges that this operation was not necessary and that as a result of it plaintiff suffers anguish, disfigurement and disabling loss of health for the remainder of his life. Obviously anticipating a plea of prescription of one year, plaintiff alleges that he became aware that the surgery was unnecessary in October of 1974.
The petition was filed December 30, 1974, which is in excess of three and one-half years after the surgery.
The defendants appeared through the Louisiana Health and Human Resources Administration, the agency of the State of Louisiana which administers its hospitals, and filed a motion for summary judgment. To the motion were attached exhibits and affidavits. On the basis of these, the defendants urged three grounds for the motion: (1) that the plaintiff consented to the operation (2) that the operation was necessary, and (3) that the claim is barred by the prescription of one year.
We will confine our consideration to the issue of prescription, because we conclude that the motion was properly granted on that basis.
Supporting defendants' motion was an affidavit executed by John H. Waite, M. D., presently professor of surgery at Tulane University School of Medicine. The rest of this paragraph describes the relevant contents of that affidavit. Dr. Waite is personally familiar with the treatment of plaintiff. In early 1971, plaintiff was found to have carcinoma of the tongue. The plan of treatment required removal of the teeth followed by radiation therapy, and removal of the neck lymph nodes and muscles. Removal of the teeth and radiation therapy were performed first, and then on May 14, 1971, the surgery was performed. Mr. Lasseigne consented to the surgery. Thereafter, he made his appointments at the surgery clinic at regular intervals until July 2, 1972, after which he failed to keep his followup appointments. Without that surgery, Mr. Lasseigne had a 99.9% probability of either being dead or dying by this time (the affidavit was dated January 30, 1975). Even with the surgery, he had only a 20% chance to survive for a five year period free of his disease, and he *763 is considered quite fortunate if he is free of his disease at this time.
In opposition to the motion, plaintiff filed his own affidavit, executed before the trial judge. We quote from it:
"(g) When I returned from New Orleans completely cured and when (sic) to let Dr. Waite examine me and he saw that the cancer was cured he actually looked disappointed.
"He then begin to tell me that I needed surgery that I am now sure I never needed at all.
"While telling me I needed neck surgery etc., he was making a thumbs down sign to his confederate, Dr. Weber, who was standing behind me
"When I looked around and saw Dr. Weber there be (sic) was nodding his head in agreement wearing a cunning foxy grim (sic) on his face.
"At first, I didn't think that this concerned me and believing these two doctors who assured me that if I had this surgery to my neck that I would be healed up in two or three weeks and everything would be just fine.
"I reentered the hospital again and on the night before the surgery I suddenly awoke to the realization that there was no cancer to spread as they had claimed was the purpose of the operation and that I didn't need any such operation.
"I then on the afternoon of May 13th, 1971 told the ward doctor that I didn't want the operation and, while he continued trying to talk me into having it. I vigorously and repeatedly refused it.
"(h) When this ward doctor saw that he couldn't persuade me to agree to the operation by (sic) left and a few minutes later in came Dr. Burton Weber.
"Dr. Weber came to my bedside at about dark that day May 13th, 1971 and hooked his eyes to mine and started to work on me. He told me that they had been kind to me and that they were my friend so I should let them do the operation.
"I was well aware that this was not true yet I had no will power to resist Dr. Weber's suggestions. I had a strange helpless feeling and agreed with Dr. Weber against my will. Apparently my mind was subverted by hypnosis or some type of psychiatric induced mental aberration. Of course, it may be that the brain washing was partly or wholly achieved through drugs administered to me. In any event I did not posess (sic) free will or a competent mind at the time.
"This is what Dr. Waite calls consent. It will take a trial on the merits of the case to find out further what Dr. Weber did to me on May 13th, 1971 to get me to sign.
"(i) I was told after the operation by Dr. Weber that there was no cancer in anything that was removed in the operation and that the operation would never heal.
"Again, at that time, I did not take that seriously since I couldn't believe that they would do that to me. It wasn't until the fall of 1974 that the truth dawned on me that they had deliberately and maliciously maimed me. Now, after almost four years, I can see clearly what their plan of treatment was."
The quoted language of the affidavit was obviously intended to establish that the question of plaintiff's consent to the operation was an issue of fact. We agree that this affidavit leaves thoroughly at issue the question of his consent, but it just as thoroughly removed from contest any question of his knowledge because he said that:
". . . on the night before surgery, I suddenly awoke to the realization that there was no cancer to spread as they had claimed was the purpose of the operation *764 and that I didn't need any such operation."
and,
"I was told after the operation by Dr. Weber that there was no cancer in anything that was removed in the operation and that the operation would never heal."
Thus, by his own sworn admission, plaintiff had actual knowledge of the alleged facts upon which his cause of action is based. He was aware of this both on the eve of surgery, May 13, and on the day of surgery, May 14, 1971.
The petition is based on an alleged delict. Therefore, the prescription provided by LSA-R.C.C. art. 3536 is applicable. Article 3537 provides that the one year prescription provided for in Article 3536 runs from the date on which the damages were sustained. In Lucas v. Commercial Union Insurance Company, 198 So.2d 560 (La.App. 1 Cir. 1967), we held that the prescription does not commence to run until plaintiff is aware of the delict and its damages. We also held in that case that where an action for personal injuries is brought more than one year subsequent to the delict, it falls upon plaintiff to show that appropriate knowledge of his cause of action was not acquired until within a year prior to the filing of suit.
In Hunter v. Sisters of Charity of Incarnate Word, 236 So.2d 565 (La.App. 1 Cir. 1970) we applied the Lucas rules to an exception of prescription. The suit was brought by a patient against the hospital. It was based upon the alleged negligent attention given to the patient by hospital employees after a fall. The fall occurred August 12, 1967. Suit was filed November 18, 1968. Plaintiff alleged she acquired knowledge of the incident on November 26, 1967. We affirmed a judgment sustaining the plea of prescription, because we found that plaintiff
". . . had knowledge from the beginning both of the nature of her injuries and the express action of defendant to which she attributed her condition."
The rules applicable to the commencement of the running of prescription ex delicto as announced in Lucas and Hunter are still viable. Cartwright v. Chrysler Company, 255 La. 598, 232 So.2d 285 (1970), and Steel v. Aetna Life & Casualty, 304 So.2d 861 (La.App. 3 Cir. 1974).
Prescription on Mr. Lasseigne's claim commenced to run on May 14, 1971. He was then fully aware of what the surgery accomplished, and that it was, in his opinion, a delict. He was aware of both the tort and his damages. As to this, there is no genuine issue of material fact. Thus, the suit filed upon that cause of action on December 30, 1974, came too late. For these reasons, the judgment of the trial court is affirmed at appellant's costs.
Affirmed.