498 So.2d 23 (1986)
Paul J. LAYTON
v.
WATTS CORPORATION, et als.
No. 85-CA-259.
Court of Appeal of Louisiana, Fifth Circuit.
January 23, 1986.
On Rehearing November 10, 1986.
M.H. Gertler, Gertler & Gertler, New Orleans, for plaintiff/appellant.
Rebecca L. Stafford and Daniel J. Caruso, Simon, Peragine, Smith & Redfearn, Christina P. Fay, Hulse, Nelson & Wanek, Robert B. Deane and Frank V. LeBlanc, III, New Orleans, for defendants/appellees.
Before BOUTALL, BOWES and GAUDIN, JJ.
BOWES, Judge.
This case comes to us on appeal from a judgment of the 24th Judicial District Court in favor of the defendants, maintaining their exception of prescription.
The subject suit is one in tort  specifically, plaintiff has alleged that he is a victim of pneumoconiosis, commonly referred to as silicosis. In his petition, Mr. Layton averred that in his capacity as sandblaster, and/or painter, for several of the defendants, he was exposed to dangerously-high levels of toxic fibers and other dangerous materials; that the protective masks and hoods manufactured by other defendants were defective in that they failed to protect plaintiff adequately; that sand manufactured by Tri Parish Sand Corporation was defective; and that he was not provided with a safe place to work. As a result of these acts or omissions, plaintiff asserts that he contracted the lung disease referred to hereinafter as silicosis.
Paul Layton was employed by several of the defendant companies as a sandblaster for a number of years. In June, 1979, he went to work for Eymard. At that time, he was obliged to take a physical, including X-rays. The examining physician told plaintiff that his lungs were "bad." He did not elaborate as to plaintiff's condition; aware that plaintiff was a sandblaster and a smoker, the only advice the doctor gave to Mr. Layton at that time was to quit smoking. In response to defendant's inquiry at his deposition, plaintiff stated:
"Well, by him telling me to quit smoking, figured, you know, smoking probably was bothering my lungs, that I should quit."
There was no follow-up to this physical at Eymard. In February of 1980, plaintiff went to work at Watts Corporation. He was not given a chest X-ray until February of 1981, by which time he had begun to experience dizziness, shortness of breath, and coughing spasms. It should be noted *24 that plaintiff was X-rayed as a routine matter, not due to his growing symptoms. At that time, the X-rays were again found to be abnormal. When plaintiff contacted the doctor (which he did of his own accord, having noticed that the report was marked "abnormal"), he testified the doctor advised him as follows:
He [the doctor] told me it, he didn't know what it was, that I had sort of a build-up on my lungs. He didn't know what it was from. I'm quite sure he said he knew one thing, that smoking wasn't helping it, and he said that I should not be around dust too much.
The only follow-up attempted by Watts was to transfer Layton to another position where he would not be in contact with as much dust. There was no diagnosis and no further medical follow-up whatsoever. Mr. Layton was never advised as to the precise reasons for his transfer, only that it was "easier" for him.
In May, 1981, plaintiff went to the public health center for more X-rays, since he continued to feel ill. Dr. Morton Brown was the physician in charge, who viewed the X-rays and had plaintiff admitted to West Jefferson Hospital.
Dr. Brown's medical report states that the X-rays had characteristics of tuberculosis and emphysema, and that Mr. Layton was hospitalized for a work-up for the possibility of tuberculosis and respiratory insufficiency. A number of tests were performed. Plaintiff testified that Dr. Brown did not give him the results of those tests when he got out of the hospital and that he was not told of these results until July 6th or 7th of 1981, when he went to Dr. Brown's office and was told, for the first time, of a diagnosis of silicosis. In addition, it was stipulated that July 6th was the date that Dr. Brown gave his diagnosis (to plaintiff). Also, the record shows that a "bronchospasm evaluation with report" was made on 07/06/81.
Plaintiff filed suit on July 6, 1982. Defendants contend that the prescriptive period began to run in February of 1981, when he began to experience symptoms. They aver that actual or constructive notice, which commenced the running of this prescription, was had by plaintiff in May, 1981, when he consulted Dr. Brown. Defendants also aver that June 30, 1981, which was the date plaintiff quit work (prior to the actual diagnosis) is the outside date at which plaintiff can be held to have had such constructive notice.
Defendants cite the case of Yarbrough v. Louisiana Cement Company, Inc., 370 So.2d 602 (La.App. 4th Cir.1979), writ denied 373 So.2d 531 (La.1979) being chiefly dispositive of the issues herein.
In Yarbrough, the plaintiff brought suit for injuries against various former employers allegedly resulting from exposure to noxious substances at work. In finding that plaintiff's suit had prescribed, the 4th Circuit stated:
The trial judge found that plaintiff had knowledge of the cause of action on January 16, 1974, more than a year before service of the U.S. District Court suit. We agree. The exceptors introduced into evidence a deposition of plaintiff given in connection with this case and plaintiff's answers to written request for admission of facts. The deposition demonstrates that plaintiff had consulted his doctor in 1972 complaining of shortness of breath and pulmonary difficulties, and that thereafter during his course of employment he made a number of complaints to his employers concerning the emissions from the neighboring cement plant as well as the environment in his own place of employment. He further admitted that he consulted the same doctor on January 16, 1974 with the complaint of shortness of breath and on that occasion he told the doctor that he worked in a dusty environment and that he was having trouble breathing following working. The evidence preponderates that the plaintiff's knowledge of pulmonary problems and the symptoms arising from exposure to noxious elements at various times during his working hours was sufficient to begin the running of the prescriptive period, although he may *25 not have known of the precise effect it had on him. We refer to the case of Cartwright v. Chrysler Corporation, 255 La. [597] 598, 232 So.2d 285 (La.1970) at page 287:
"* * * Also, it is not necessary that the party have actual knowledge of the conditions as long as there is `constructive notice.' Whatever is notice enough to excite attention and put the owner on his guard and call for inquiry is tantamount to knowledge or notice of every thing to which inquiry may lead and such information or knowledge as ought to reasonably put the owner on inquiry is sufficient to start the running of prescription."
We also refer to the following cases which have applied the same principles to medical cases wherein the plaintiff had knowledge of his injury, but was perhaps not aware of the full measure of damages occasioned. Duhon v. Saloom, 323 So.2d [202] 203 (La.App. 3rd Cir.1975); Marcel v. Hospital Corp. of the Sisters of St. Joseph, supra [322 So.2d 302]; Lasseigne v. Earl K. Long Hospital, supra [316 So.2d 761].
Thus, defendants urge, even though plaintiff did not receive an actual diagnosis of silicosis until after he quit work, that the knowledge of plaintiff prior to that diagnosis should, as in Yarbrough, have put plaintiff on notice so as to start the running of prescription. Plaintiff stated in his deposition, as well as at the hearing, that he quit work to get out of the dust and also due to a falling-out with a supervisor. For example:
Q. You quit from Watts because of what?
A. Because of the dust. And because the doctor told me that it would be best for my health to get away from it.
and
Q. How come you wanted to be out of the dust?
A. I knew it wasn't no good for me.
Thus, defendants contend plaintiff demonstrated prior to July 6, when he was finally diagnosed, that he knew that the work environmental dust was deleterious to his health.
It would appear with only these admissions that, under Yarbrough, plaintiff's suit prescribed no later than June 30, 1982, one year after he quit work.
There are, however, several factors in the present case which distinguish it from Yarbrough. To begin with, the educational status and medical sophistication of Mr. Yarbrough were not discussed in that opinion. Here, however, we are presented with a plaintiff who attended school until the fifth grade (he was 16 at the time). He completed a "G.E.D." in the armed services. He can read and write (he could read a newspaper and get a general idea of its contents). He has been employed as a laborer all of his adult life. All in all, Mr. Layton is clearly an unsophisticated person with little education to whom this Court is unable to impute any particular knowledge of anatomy, medicine, etc. He showed no special familiarity with, nor understanding of, illness in general, and with lung disease in particular, by which we mean that he showed no specific comprehension of cause and effect relative to disease processes. In other words, he relied on his physician's expertise.
In 1979, after an X-ray which is distinctly abnormal, he was told by the company physician, who was fully aware of Layton's occupation, simply that his lungs were "bad" and to quit smoking. This advice could cause any reasonable man to believe that anything wrong with his lungs was due solely to smoking. (Remarkably, the same general opinion was expressed by defendant's doctor, Hans Weill, 3 years later  infra, this opinion). In February, 1981, he was told by Watts' company doctor that the cause of the "build-up" in his lungs was unknown. Plaintiff's recollection of the medical advice given to him, quoted hereinabove, demonstrates that plaintiff was given as much or more reason to suspect that smoking exacerbated his *26 problems as did the dust. At no point prior to July 6, 1981 was he given a diagnosis of silicosis.
Instead of any medical follow-up, the company chose to place plaintiff in a different crew to minimize the dust problem. No reasons were given for this change:
Q. Did they tell you why they wanted to get you out of the dust?
A. No. They said they wanted to get me out of the dust to make it easier on me. That's all they said.
We are not convinced from the record that Mr. Layton connected the onset of his symptoms with his presence at work, as did the plaintiff in Yarbrough. In fact, it appears to this Court that, from his previous experience with company physicians, Mr. Layton could have attributed his symptoms to smoking, as reasonably as to his work environment.
The Supreme Court considered the burden of such a plaintiff in Cordova v. Hartford Accident & Indemnity Co., 387 So.2d 574 (La.1980). There, the plaintiff suffered a loss of libido and the shrinkage of one testicle which he failed to connect to a vasectomy earlier performed upon him. In deciding the case had not prescribed, the court stated:
The law does not impose upon a layman the obligation to self-diagnose a psychopathological condition which reproductive biologists themselves do not fully understand. Plaintiff had confidence in his physicians' skill and judgment. [...]
The mere apprehension by plaintiff that "something was wrong" is not sufficient to start prescription unless plaintiff knew or should have known by exercising reasonable diligence that there was a reasonable possibility that his problem condition, the loss of libido and/or impotence, may have been caused by acts of malpractice. We are not prepared to charge plaintiff with such knowledge prior to June, 1976, when he became impotent and learned that he had virtually lost both testicles.
Even though Mr. Layton admittedly quit his job, at least partially to escape the dust for health reasons, it cannot be held that he was under an obligation to have correctly diagnosed both his disease and its causes, especially when the doctors did not do so. He also tried to quit, or at least cut down, on his smoking of cigarettes, upon his physician's advice.
The plaintiff appears to suffer from a plurality of physical problems, and his symptoms were initially attributed, even by Dr. Brown in June, to tuberculosis and emphysema. In this regard, as a final stabilizer of our opinion, we note that on June 4, 1982, one month before plaintiff filed suit, Dr. Hans Weill wrote to one of the defense counsel, at whose request plaintiff had been examined on April 12, 1982 and, in that letter, Dr. Weill opined that Mr. Layton "currently has severe chronic obstructive lung disease, bronchitic and emphysematous in type, which is undoubtedly primarily related to his history of very heavy long-term cigarette smoking. "A diagnosis of silicosis was not established.
While we do not attempt to determine the actual nature of plaintiff's illness, we hold that plaintiff cannot be held to have actual or constructive notice of his cause of action or to have accurately diagnosed or connected his own disease and its causes sufficiently enough to start the running of prescription, particularly when he did make inquiry as to his condition but was not told accurately or conclusively what caused it. It is important to remember that one month prior to suit the medical experts did not agree.
By this, we do not mean that an accurate or final diagnosis is necessary in each case of this type to start the tolling of prescription. Such a general standard has not been adopted as the law of Louisiana. However, under the facts and circumstances of this case, we hold that July 6, 1981, the date on which plaintiff was finally diagnosed by Dr. Brown and informed of this diagnosis, was the date on which prescription began to run.
Accordingly, we are of the opinion that plaintiff's suit was timely filed and it was *27 manifestly erroneous for the learned trial judge to conclude otherwise in his brief statement dictated into the record. In effect, we know very little about why the trial judge concluded as he did.
For the foregoing reasons, the judgment of the trial court maintaining the defendants' exception of prescription is reversed, and the case is remanded to the district court for trial. Costs are taxed to the defendants/appellees.
REVERSED AND REMANDED.
BOUTALL, C.J., concurs.
BOUTALL, Chief Judge, concurring.
I concur in result with the majority opinion, believing that these exceptions of prescription filed by two furnishers of equipment, E.D. Bullard Company and American Optical Corporation, should be dismissed and the matter remanded for trial on the merits. However, I cannot conclude that the trial judge was manifestly erroneous in his findings of fact. The problem here is application of the law to a set of facts which are largely undisputed.
The basic issue in this appeal is when did the prescriptive period begin to toll. The trial judge concluded that the period began when the plaintiff quit work, and the majority of this court has concluded that it began when the plaintiff received the doctor's report. Simply put, the question is when did plaintiff have such actual or constructive notice of facts as reasonably to put him on his guard and call for inquiry. I of course subscribe to the principle announced in the case of Yarbrough v. Louisiana Cement Co., Inc., 370 So.2d 602 (La. App. 4th Cir.1979), writ denied 373 So.2d 531 (La.1979), as quoted in the majority opinion.
The facts here are not the same as in Yarbrough and lead to a different result. Here, plaintiff had been to several doctors and his condition had been diagnosed as emphysema, which had been attributed not to dust but to heavy smoking. While there are warnings to keep out of a dusty atmosphere in this record, none of the original doctors informed plaintiff that the dusty atmosphere caused or contributed to his condition. Plaintiff may have had some suspicion that dust in the workplace aggravated his condition somewhat because it got progressively worse, nevertheless he continued to smoke for some while. Thus, we have a situation where the workman was making inquiry, but based on his experience and the diagnosis of the doctors, he had no reasonable basis to believe that he had a problem caused by dust.
It was not until Dr. Brown informed him that he now had pneumoconiosis or silicosis that he learned for the first time that he had a lung condition caused by exposure to dust. He could not reasonably make a causal connection between his condition and the alleged furnishing of faulty or inadequate safety equipment until then. The situation here is somewhat analogous to the medical malpractice cases cited by the majority in that the issue resolves around the question of how much of a medical burden can we reasonably and fairly place on such a workman. When prior inquiry results in a different diagnosis, it is not reasonable to require him to reach a contrary self-diagnosis.
Finally, as a precaution, I point out that, for the purposes of these exceptions, I presume the various diagnoses to be the basis for action taken or not taken without regard to veracity. A trial on the merits may show otherwise.

ON REHEARING
In our original opinion in this case we held that because prescription had begun to run on July 6, 1986, when the plaintiff's physician informed him that his diagnosis was silicosis, his tort suit had been filed timely.
Upon rehearing, we agree with our original majority opinion and the concurring opinion that the trial court's judgment maintaining the exception should be reversed, but withdraw our holding that the petition was filed timely. Instead we decide only that there was insufficient evidence in the hearing of the exception to support the trial judge's decision to maintain the exception. In Montgomery v. *28 Breaux, 297 So.2d 185 (La.1974), the court stated at 187:
"All that must be considered in the peremptory exception of prescription is whether there is sufficient evidence to show that the alleged time period has run under the requirements of the particular code articles involved...."
The question of prescription may be reurged at a trial of the merits.
Accordingly, we reverse the dismissal of plaintiff's suit on the exception of prescription and remand for trial.
REVERSED AND REMANDED.