# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

October 18, 2024

Lyle W. Cayce
Clerk

No. 24-30105

_____

Sarah Rumage Whalen, *Individually and as surviving child* of
Joseph P. Rumage, M.D.; Joseph Paul Rumage, Jr.,
*Individually and as surviving child* of Joseph P. Rumage, M.D.;
William Simms Rumage Individually and as surviving
child of Joseph P. Rumage, M.D.,

*Plaintiffs—Appellants*,

*versus*

Monsanto Company,

*Defendant—Appellee.*

_____

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:19-CV-9334

_____

Before Willett and Douglas, *Circuit Judges*, and Morales, *District Judge*.[*]

Per Curiam:[†]

_____

[*] United States District Judge for the Southern District of Texas, sitting by designation.

[†] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

Appellants, the children of Joseph P. Rumage, M.D. ("Dr. Rumage"), sued Appellee Monsanto Company ("Monsanto") on Dr. Rumage's behalf, alleging that Monsanto's herbicide, Roundup, caused him to contract and subsequently pass away from skin cancer. The district court ruled in favor of Monsanto on various evidentiary issues, and granted summary judgment in Monsanto's favor. We AFFIRM the district court's evidentiary rulings, AFFIRM the district court's order granting partial summary judgment on Appellants' LPLA and negligence claims, and AFFIRM the order granting partial summary judgment on Appellants' redhibition and survival claims.

# I

This case arises out of injuries attributed to Roundup, a herbicide manufactured by Appellee Monsanto Company. Dr. Rumage contracted with Monsanto to provide professional ophthalmological services to its employees at its glyphosate-manufacturing plant in Luling, Louisiana. Glyphosate is the active ingredient in Roundup and has been the subject of frequent litigation involving allegations of its link to non-Hodgkin's lymphoma. Dr. Rumage worked at the Luling plant for approximately twenty years. In addition, as an avid gardener, he used Roundup on a regular basis at his home. In November 2015, Dr. Rumage was diagnosed with squamous cell carcinoma, a type of skin cancer, and he passed away in his home in April 2018.

On April 12, 2019, his children, Appellants Sarah Rumage Whalen, Joseph Paul Rumage, Jr., and William Simms Rumage ("Appellants") filed the instant survival and wrongful death action, alleging that Dr. Rumage's exposure to and use of Roundup caused him to develop squamous cell carcinoma, ultimately resulting in his death. Appellants brought the following claims: (1) dangerous design, pursuant to the Louisiana Products Liability Act ("LPLA"); (2) failure to warn, pursuant to the LPLA; (3)

No. 24-30105

breach of implied and express warranty, pursuant to the LPLA; (4) negligence; (5) redhibition; and (6) toxic substances negligence. Appellants also sought punitive damages. Appellants' complaint did not include the word arsenic but more generally alleged that "the carcinogenic characteristic of glyphosate, Roundup, and Roundup products rendered the product defective, absolutely useless, and unfit for its intended use."

During discovery, Monsanto deposed Dr. Rumage's widow, Kay Donnelly. Regarding Dr. Rumage's knowledge of Monsanto litigation, Donnelly testified as follows:

> Q:     When did you first become aware of the lawsuits against Monsanto involving Roundup in general?
> A:     In general? Whenever he was talking about it after he read it in the papers.
> . . .
> Q:     And so you learned about this type of litigation from your husband; is that correct?
> A:     Correct.
> Q:     Okay. And do you recall what year that was? If I asked you that before, I apologize.
> A:     I – I don't know. I'm figuring around 2015, 2016.
> Q:     And is it fair to say that your husband expressed no interest in filing a lawsuit against Monsanto?
> A:     Yes. He said the science wasn't there.

After this testimony, Monsanto moved for partial summary judgment, arguing that Appellants' redhibition and survival actions were prescribed, because Dr. Rumage knew of his ability to bring a lawsuit against Monsanto as early as 2015 or 2016 and failed to bring a lawsuit within one year of that conversation.

Appellants argued that the claims were not prescribed based on the discovery rule—that Appellants could not have discovered their claims until

2018. According to Appellants, Monsanto failed to disclose arsenic as an ingredient or by-product of Roundup. Yet, when Appellants ordered testing and analysis of nine Roundup products from the Mississippi State University, five of the tested Roundup products contained arsenic. In opposition, Appellants also relied on a study finding that arsenic exposure caused squamous cell carcinoma. Appellants further attached as evidence internal emails from Monsanto, revealing admissions that their products may contain arsenic. According to Appellants, these emails were publicly released as part of discovery from another lawsuit in December 2018. Appellants thus argue that they could not have known about their ability to sue before 2018, and under the discovery rule, their claims are timely.

The district court determined that Appellants' allegations that Roundup contained a carcinogen and the more specific allegation that Roundup contained arsenic were "functionally the same." Then, the district court found that Dr. Rumage knew or should have known of his ability to sue Monsanto for his cancer as early as 2015 or 2016. Therefore, because Appellants did not file suit until 2019, well outside the one-year prescriptive period, the district court granted summary judgment, finding Appellants' redhibition and survival claims were prescribed.

After the district court granted Monsanto's motion for partial summary judgment, discovery continued as to Appellants' remaining LPLA and negligence claims. Appellants retained as an expert Dr. Scott Boniol, a hematologist and oncologist, to testify as to general and specific causation. Monsanto moved to exclude Dr. Boniol's testimony. The district court found that Dr. Boniol was not qualified to testify in the relevant field and further found that both his general and specific causation methodology was unreliable. On those bases, the district court granted Monsanto's motion and excluded Dr. Boniol's testimony.

No. 24-30105

Also, during discovery but after the expert report deadline, Appellants disclosed to Monsanto an "affidavit of general causation" by Dr. Raymond Clay Gould. Monsanto moved to strike the affidavit as an untimely expert report. Appellants argued that the affidavit was timely as a rebuttal report. The district court addressed Monsanto's motion in the same order as the motion to exclude. Determining that the affidavit did not properly fall within the definition of a rebuttal report pursuant to Federal Rule of Civil Procedure 26(a)(2)(D)(i), the district court granted Monsanto's motion and held that Appellants could not use the affidavit "to supply evidence on a motion, at a hearing, or at a trial."

With Appellants' experts excluded, Monsanto moved for partial summary judgment as to the remaining LPLA and negligence claims, arguing Appellants could not prove causation without an expert. The district court agreed and granted summary judgment for Monsanto on Appellants' remaining claims.

Appellants appealed from the district court's order granting partial summary judgment on the issue of prescription; the district court's order excluding Dr. Boniol's testimony and striking Dr. Gould's affidavit; and the district court's order granting partial summary judgment on the remaining LPLA and negligence claims, finding no causation.

## II

We review the district court's grant of summary judgment *de novo*, applying the same standards as the district court. *Acadian Diagnostic Lab'ys, L.L.C. v. Quality Toxicology, L.L.C.*, 965 F.3d 404, 409 (5th Cir. 2020). Though we review findings of fact for clear error, we review questions of law *de novo*. *Mclane Food Servs., Inc. v. Table Rock Rests., L.L.C.*, 73 F.3d 375, 377 (5th Cir. 2013).

No. 24-30105

"Evidentiary rulings are reviewed under a manifest error standard." *Berry v. Armstrong Rubber Co.*, 989 F.2d 822, 824 (5th Cir. 1993). "A manifest error is one that 'is plain and indisputable, and that amounts to a complete disregard of the controlling law.'" *Puga v. RCX Solutions, Inc.*, 922 F.3d 285, 293 (5th Cir. 2019) (quoting *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004)).

"If the district court's ruling depended on the admissibility of certain evidence," as is the case here, "appellate review is a two-tiered process." *Berry*, 989 F.2d at 824. "First, we review the evidentiary rulings under the manifest error standard, then review the trial court's summary judgment decision *de novo*." *Id.*

## III

We first address whether the district court erred in finding Appellants' redhibition and survival claims were prescribed.

On appeal, Appellants argue that the district court erred in finding that their redhibition and survival claims were time-barred, arguing the court should have applied the discovery rule. They argue that prescription or the statute of limitations should run from December 25, 2018, when it became publicly known that Roundup products may contain arsenic. Before this date, Appellants argue, the only cancer associated with Roundup was non-Hodgkin's lymphoma. Thus, Appellants argue that "Dr. Rumage never made the nexus between his squamous cell carcinoma and his Roundup use because of Monsanto's fraud in failing to disclose the presence of arsenic."[1]

_____

[1] Appellants also argue on appeal that the continuing tort doctrine makes their claims timely. However, Appellants make this argument for the first time on appeal, and we decline to consider it. *Rollins v. Home Depot USA*, 8 F.4th 393, 398 (5th Cir. 2021) ("We

No. 24-30105

Monsanto argues that the discovery rule is not applicable because Dr. Rumage had actual knowledge of his claims against Monsanto: "Uncontroverted evidence shows both that Dr. Rumage was aware of (1) his injury and (2) of claims that Roundup causes cancer over a year before his death." Further, in response to Appellants' argument that the December 2018 date is controlling, Monsanto contends that "actual knowledge of the precise causal theory behind one's claim is not the standard . . . . Rather, 'the prescriptive period commences when there is enough notice to call for an inquiry about a claim, not when an inquiry reveals facts or evidence that specifically outline the claim.'"

## A

We review prescription issues *de novo*. *Brown v. Slenker*, 220 F.3d 411, 419 (5th Cir. 2000). "Prescription is an affirmative defense, and defendants bear the burden of its proof at trial." *Ducre v. Mine Safety Appliances*, 963 F.2d 757, 760 (5th Cir. 1992).

Regarding redhibition claims under Louisiana law, "[a] seller is deemed to know that the thing he sells has a redhibitory defect when he is the manufacturer of that thing." *Martco Ltd. P'ship v. Bruks Inc.*, 430 F. App'x 332, 336 (5th Cir. 2011) (per curiam) (quoting La. Civ. Code art. 2545). Thus, a redhibition claim is subject to a one-year prescriptive period from the day the defect was discovered by the buyer.[2] "The manufacturer has the burden of proving by a preponderance of the evidence that the purchaser

_____

do not ordinarily consider issues that are forfeited because they are raised for the first time on appeal.").

[2] La. Civ. Code art. 2534.B ("The action for redhibition against a seller who knew, or is presumed to have known, of the existence of a defect in the thing sold prescribes in one year from the day the defect was discovered by the buyer or ten years from the perfection of the contract of sale, whichever occurs first.").

7

discovered the vice more than one year prior to filing suit." *Beth Israel v. Bartley, Inc.*, 579 So. 2d 1066, 1072 (La. Ct. App. 4 Cir. 1991).

For survival actions, normally, the prescriptive period is "'one year from the death of the deceased.'" *Lennie v. Exxon Mobil Corp.*, 251 So. 3d 637, 649 (La. App. 5 Cir. 2018) (quoting LA. CIV. CODE art. 2315.1A). However, being that survival actions are "*derivative* of the primary tort victim's action," they are "dependent upon the primary tort victim having a viable cause of action on the date of his death." *Id.* (emphasis in original). "Consequently, if the cause of action of the primary tort victim has prescribed prior to his date of death, then there is no viable action to transfer to his statutorily-designated beneficiaries." *Id.* (citing *Richardson v. Avondale Shipyards, Inc.*, 600 So.2d 801, 803 (La. App. 5 Cir. 1992)). Dr. Rumage's underlying claims—delictual actions now brought by Appellants under the LPLA—are subject to a prescriptive period of one year, "which 'runs from the day injury or damage is sustained.'" *Brown v. R.J. Reynolds Tobacco Co.*, 52 F.3d 524, 527 (5th Cir. 1995) (quoting LA. CIV. CODE art.3492).[3] Moreover, "[t]he defendant has the initial burden of proving that a tort claim has prescribed, but if the defendant shows that one year has passed between the tortious acts and the filing of the lawsuit, then the burden shifts to the plaintiff to prove an exception to prescription." *Terrebonne Par. Sch. Bd. v. Columbia Gulf Transmission Co.*, 290 F.3d 303, 320 (5th Cir. 2002) (citing

---

[3] Louisiana Civil Code article 3492 has been repealed and replaced by article 3493.1, which provides for a two-year prescriptive period for delictual actions. LA. CIV. CODE art. 3493.1. However, because the provisions of article 3493.1 are given prospective application and only apply to delictual actions arising after July 1, 2024, Appellants' survival claim remains governed by the one-year prescriptive period under article 3492. *See* Act of June 3, 2024, No. 432, § 3, 2024 La. Sess. Law Serv.

*Miley v. Consol. Gravity Drainage Dist.*, 642 So. 2d 693, 696 (La. App. 1 Cir. 1994)).

As to both redhibition and survival actions, the doctrine of *contra non valentem,* known as the discovery rule, may toll the commencement of a prescriptive period. The discovery rule "prevents the commencement of the running of prescription 'when the plaintiff does not know nor reasonably should know of the cause of action.'" *Terrebonne Par. Sch. Bd.*, 290 F.3d at 320 (quoting *Picard v. Vermillion Par. Sch. Bd.*, 783 So. 2d 590, 594 (La. App. 3 Cir. 2001)). However, "because *contra non valentem* is a judicial exception to the statutory rule of prescription, 'Louisiana courts strictly construe this doctrine and only extend its benefits up to "the time that the plaintiff has actual or constructive knowledge of the tortious action."'" *Id.* (quoting *Eldredge v. Martin Marietta Corp.*, 207 F.3d 737, 743 (5th Cir. 2000)).

While actual knowledge is clear, "[t]he question of constructive knowledge is more complex." *Id.* at 321. "Generally, knowledge is imputed only when the plaintiff has 'information sufficient to excite attention and to prompt further inquiry.'" *Id.* (quoting *Picard*, 783 So. 2d at 595). "This sufficiency standard asks what is it that would excite the attention of or prompt action by a reasonable person." *Id.* "Thus, 'the heart of the inquiry into constructive knowledge is the *reasonableness* of [the] plaintiff's *inaction*.'" *Id.* (quoting *Picard*, 783 So. 2d at 595) (emphasis in original). "'The educational status and medical sophistication' of a plaintiff is relevant to assessing whether a plaintiff acts reasonably in delaying the filing of a tort action." *Ducre*, 963 F.2d at 761 (quoting *Layton v. Watts Corp.*, 498 So.2d 23, 25 (La. App. 5 Cir.1986)).

In this context, summary judgment is appropriate unless "there is an issue of fact as to when the limitations period began, such as in products-liability actions in which the statutory period begins to run when plaintiff

knew or should have known that the injury was caused by defendant's product." *Terrebonne Par. Sch. Bd.*, 290 F.3d at 319. We view the summary judgment evidence in the light most favorable to the non-movant. *Id.* at 323.

## B

The district court properly found that Appellants' redhibition and survival claims are prescribed.

We first address the redhibition claim. The deposition testimony of Donnelly reveals that Dr. Rumage became "aware of [] lawsuits against Monsanto involving Roundup" in 2015 or 2016 "after he read it in the papers."[4] Dr. Rumage elected not to file suit against Monsanto at that time because "[h]e said the science wasn't there yet." Contrary to Appellants' assertion that this testimony presents two different constructions, only one interpretation is apparent: By expressing his knowledge of litigation against Monsanto pertaining to Roundup around 2015 or 2016, Dr. Rumage showed he knew of allegations that Roundup contained a carcinogen and chose not to bring suit during that time. As Appellants filed this suit against Monsanto in 2019, well beyond the one-year prescriptive period from when Dr. Rumage discovered "the defect" underlying Appellants' redhibition claim, the claim is prescribed. La. Civ. Code art. 2534.B.

Appellants' survival claim is likewise prescribed. Appellants filed suit in 2019—over a year from when Dr. Rumage was diagnosed with cancer in

---

[4] Insofar as Appellants contend that Dr. Rumage's statements to Donnelly are hearsay, we find that the statements are indeed admissible as admissions of a party opponent. *See Klocke v. Watson*, No. 22-10348, 2023 WL 2823060, at *5 (5th Cir. Apr. 7, 2023) (unpublished); *United States v. Est. of Mathewson*, 2016 WL 7409855, at *4 (W.D. Tex. Apr. 19, 2016); *Estate of Shafer v. C.I.R.*, 749 F.2d 1216, 1220 (6th Cir. 1984); *Phillips v. Grady Cnty. Bd. of Cnty. Comm'rs*, 92 F. App'x 692, 696 (10th Cir. 2004) ("[A] decedent 'through his estate, is a party to [an] action' so that the decedent's statements 'are a classic example of an admission.'" (citing and quoting with approval *Shafer*, 749 F.2d at 1220)).

No. 24-30105

2016. Because Dr. Rumage's 2016 diagnosis represents "the day injury or damage [was] sustained," LA. CIV. CODE art. 3492, Appellants' survival claim, which was brought approximately three years later, is prescribed. *See id.*; *R.J. Reynolds Tobacco Co.*, 52 F.3d at 527.

Appellants maintain that the discovery rule prevents their survival claim from prescription, alleging that the prescriptive period was tolled because Monsanto fraudulently concealed the presence of arsenic in Roundup.[5]  However, notwithstanding Appellants' reliance on the alleged arsenic obscuration during summary judgment briefing and on appeal, the word "arsenic" is never mentioned in the Complaint.  Rather, the defect alleged in the Complaint is that Roundup is carcinogenic.  That Appellants now, and at the summary judgment stage, focus on the purported presence of arsenic in Roundup does not minimize the district court's observation that "the alleged defect is that Roundup is carcinogenic"—which aligns with the face of the Complaint.

---

[5] To the extent Appellants assert that the discovery rule also saves their redhibition claim from prescription, we do not consider this argument because it was not preserved for appeal. *See Rollins v. Home Depot USA*, 8 F.4th 393, 397 (5th Cir. 2021); *Thomas v. Ameritas Life Ins. Corp.*, 34 F.4th 395, 402 (5th Cir. 2022) ("[I]n order to preserve an argument for appeal, the argument (or issue) not only must have been presented in the district court, a litigant also must press and not merely intimate the argument during proceedings before the district court." (internal citations and quotation marks omitted)).  Though Appellants' memorandum opposing summary judgment states, "Under the doctrine of *contra non valentem agere nu/la currit*, no actions for damages by Dr. Rumage had prescribed prior to his death," this general statement does not signify that Appellants raised the discovery rule argument *specifically* for their redhibition claim.  Notably, the above discovery rule language from Appellants' memorandum appears under the heading, "Plaintiffs' Survival Action Has Not Prescribed."  This is relevant since Appellants' redhibition arguments appear under a different heading, "Plaintiffs have a claim in redhibition," which represents an entirely separate section of their memorandum that does not refer to the discovery rule. This suggests Appellants did not intend to raise the discovery rule argument as to their redhibition claim.

No. 24-30105

Proceeding with a reasonableness analysis, we find that Appellants have not carried their burden of demonstrating genuine disputes of material fact exist as to when the limitations period began. Per the deposition of Donnelly, Dr. Rumage had knowledge of litigation against Monsanto involving Roundup before or during the same year as his 2016 cancer diagnosis. Though Appellants state that "[t]he only cancer associated with glyphosate and [Roundup] products to that point was non-Hodgkin's lymphoma," as opposed to the squamous cell carcinoma that Dr. Rumage was diagnosed with, this observation is not dispositive. Dr. Rumage's knowledge of the lawsuits against Monsanto indicates he knew, at least constructively, of an alleged causal link between cancer and Roundup, which meets the sufficiency standard as information "that would excite the attention of or prompt action by a reasonable person." *Terrebonne Par. Sch. Bd.*, 290 F.3d at 321 (quoting *Picard*, 783 So. 2d at 595). Upon learning about the Roundup lawsuits, Dr. Rumage's medical expertise allowed him to investigate other claims that the product was carcinogenic, to which he concluded that "the science wasn't there" for his own potential cause of action. Dr. Rumage's inaction, despite learning of details that would "prompt further inquiry" by a reasonable person, precludes the discovery rule from tolling the prescriptive period on Appellants' survival claim. *Terrebonne Par. Sch. Bd.*, 290 F.3d at 321 (quoting *Picard*, 783 So. 2d at 595).

Thus, the district court did not err in granting summary judgment to Monsanto on the issue of prescription.

## IV

Before we can turn to the district court's order granting partial summary judgment as to Appellants' LPLA and negligence claims, we must

12

address the evidentiary issue that underlies the district court's ruling: whether the district court erred in excluding Dr. Boniol's expert testimony.[6]

Below, Appellants proffered Dr. Boniol as an expert on general and specific causation. Monsanto sought to exclude Dr. Boniol. The district court held that "[w]hile Dr. Boniol is clearly qualified as a treating oncologist, [it was] not satisfied that he is qualified in the relevant field under Rule 702 to offer opinions as to general and specific causation between Roundup (and its active ingredient, glyphosate) and squamous cell carcinoma." The district court recognized that "disqualification alone is ground to exclude expert testimony," but went on to address reliability as well, finding his opinions on both general and specific causation must be excluded as unreliable.

A trial court's decision to admit expert evidence is reviewed for abuse of discretion. *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 351 (5th Cir. 2007). The trial judge has "wide latitude in determining the admissibility of expert testimony, and the discretion of the trial judge and his or her decision will not be disturbed on appeal unless manifestly erroneous." *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 988 (5th Cir. 1997) (internal quotation marks and citation omitted). A manifest error is one that "is plain and indisputable, and that amounts to a complete disregard of the controlling law." *Guy v. Crown*

_____

[6] Appellants also challenge the district court's exclusion of Dr. Gould's affidavit as an untimely expert report. On appeal, Appellants argue for the first time that Dr. Gould, as Dr. Rumage's treating physician, was permitted to testify as to causation without being considered an expert. Appellants contend that "[b]ecause the Gould Declaration was strictly limited to causation, the affidavit did not run afoul of the disclosure requirements of Rule 26." This argument was not raised below in the district court, and we decline to consider it for the first time on appeal. *C.A.T. Indus. Disposal, Inc. v. Browning-Ferris Indus., Inc.*, 884 F.2d 209, 210 n.3 (5th Cir. 1989) ("Absent special circumstances, this Court will not hear issues not raised in or decided by the district court." (internal citation omitted)).

*Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004) (internal quotation marks and citation omitted).

## A

We first turn to the district court's determination that Dr. Boniol's general causation methodology was unreliable.

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. When evaluating expert testimony, the overarching concern is generally whether the testimony is relevant and reliable. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). To be reliable, expert testimony must "be grounded in the methods and procedures of science and . . . be more than unsupported speculation or subjective belief." *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012) (internal citation omitted).

Generally, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility. *See Rock v. Arkansas*, 483 U.S. 44, 61 (1987). Particularly in a jury trial setting, the court's role under Rule 702 is not to weigh the expert testimony to the point of supplanting the jury's fact-finding role. Instead, the court's role is limited to ensuring that the evidence in dispute is at least sufficiently reliable and relevant to the issue so that it is appropriate for the jury's consideration. *See Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1391–92 (Fed. Cir. 2003). At no point should the trial court replace "the adversary system." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 249–50 (5th Cir. 2002). Likewise, "[d]ifferences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility." *Huss v. Gayden*, 571 F.3d 442, 453 (5th Cir. 2009).

As the Supreme Court explained, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of

proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. While the district court must act as a gatekeeper to exclude all irrelevant and unreliable expert testimony, "the rejection of expert testimony is the exception rather than the rule." FED. R. EVID. 702 advisory committee's notes (2000) (internal citations omitted).

Here, the district court properly found that Dr. Boniol's general causation opinion—that "[c]hronic exposure to arsenic is known to cause squamous cell skin cancer directly through cell damage, as well as indirectly as a Co-carcinogen to UV light in patients that are chronically exposed to arsenic"—is unreliable. First, the district court noted that Dr. Boniol's general causation falls short because "he relies solely on arsenic-specific literature" when attempting to show that chronic exposure to Roundup (and thus arsenic by allegation) can cause squamous cell carcinoma. Dr. Boniol tries to bridge a connection between arsenic and Roundup by relying on a Mississippi State University study that tested for arsenic in nine Roundup bottles, finding that five of the bottles contained at least traceable levels of arsenic. But as the district court opined, this study does not aid the reliability of Dr. Boniol's general causation opinion. Indeed, four of the nine Roundup bottles tested showed no detectable arsenic at all, and only two of the remaining bottles contained arsenic levels above the threshold that Dr. Boniol proposed as necessary to "cause skin cancer." Dr. Boniol's opinion fares no better when supplemented by his report of internal Monsanto emails and documents discussing the presence of arsenic in their products and at the Luling plant. Dr. Boniol provides no analysis to discern what level of arsenic exposure, if any, to the public or workers at the Luling plant could be gleaned from those references.

Additionally, the district court aptly found that, as Dr. Boniol does not perform a Bradford Hill analysis, nor apply any established methodology in

his general causation report, he is unable to opine on the dose of arsenic that would cause squamous cell carcinoma. This is significant as dose-response is largely considered the most crucial element of establishing a causal relationship.[7] Moreover, Dr. Boniol does not point to any studies that discuss air or dermal exposure to arsenic leading to squamous cell carcinoma. Rather, Dr. Boniol solely relies on a study about the oral ingestion of arsenic in drinking water. This is far attenuated from identifying any risks or casual effects associated with exposure to carcinogens by using Roundup as a garden product. As such, the district court did not err by concluding that, "[w]ithout citation to specific studies finding that Roundup causes squamous cell carcinoma[,] and without any application of a methodology to studies finding that arsenic causes squamous cell carcinoma, Dr. Boniol's opinion on general causation is unreliable and therefore inadmissible."

**B**

The same is true for the district court's determination that Dr. Boniol could not serve as an expert on specific causation. The district court found that Dr. Boniol's specific causation opinion—that "Dr. Rumage's chronic exposure to Arsenic more likely than not resulted in development of squamous cell carcinoma that ultimately metastasized and took his life"— was not based on reliable methodology. The district court considered Dr.

---

[7] *See, e.g., Peairs v. BP Expl. & Prod., Inc.*, No. CV 17-3596, 2022 WL 2817852, at *4, *7 (E.D. La. July 19, 2022), *reconsideration denied sub nom. Dawkins v. BP Expl. & Prod., Inc.*, No. CV 17-3533, 2022 WL 4355818 (E.D. La. Sept. 20, 2022), *appeal dismissed sub nom. Grant v. BP Expl. & Prod., Inc.*, No. 22-30674, 2023 WL 3434056 (5th Cir. Mar. 9, 2023); *Novelozo v. BP Expl. & Prod. Inc.*, No. CV 13-1033, 2022 WL 1460103, at *8 (E.D. La. May 9, 2022); *McGill v. BP Expl. & Prod., Inc.*, 830 F. App'x 430, 433 (5th Cir. 2020); *Allen v. Pennsylvania Eng'g Corp.*, 102 F.3d 194, 199 (5th Cir. 1996) ("Scientific knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities, are minimal facts necessary to sustain the plaintiffs' burden in a toxic tort case.").

Boniol's own testimony that he did not know how much Roundup Dr. Rumage was exposed to. Further, Dr. Boniol did not know if Dr. Rumage was exposed to arsenic-contaminated Roundup *at all*. Dr. Boniol relied on the Mississippi State University study and internal emails from Monsanto to establish that Dr. Rumage was exposed to arsenic. However, as previously mentioned, "only two of the nine bottles [in the study] contained arsenic at or above the threshold Dr. Boniol adopts for causation," and moreover, Dr. Rumage died four years before the study was conducted. As to the internal emails, the district court determined that they also failed to show that Dr. Rumage was exposed to any bottles of Roundup specifically known to contain arsenic, either at the Luling plant or at his home.

The district court also found that Dr. Boniol failed to rule out "Dr. Rumage's age or other known predispositions to squamous cell carcinoma such as skin tone or eye color." The court was further troubled that Dr. Boniol "plainly admits that 'UV light exposure cannot be completely excluded,'" despite going on to conclude that "Dr. Rumage's chronic exposure to Arsenic more likely than not resulted in development of squamous cell carcinoma that ultimately metastasized and took his life." On these bases, the district court held that Dr. Boniol's opinion concerning Dr. Rumage's exposure to Roundup was "so sadly lacking as to be mere guesswork."

We cannot say that the district court abused its discretion here. As we have stated, "[s]cientific knowledge of the harmful level of exposure to a chemical, *plus* knowledge that the plaintiff was exposed to such quantities, are minimal facts necessary to sustain the plaintiffs' burden." *Allen v. Pa. Eng'g Corp.*, 102 F.3d 194, 199 (5th Cir. 1996) (emphasis added). Here, we agree with the district court that Dr. Boniol's alleged "knowledge" that Dr. Rumage was exposed to arsenic-contaminated Roundup, and Roundup's causal relationship to Dr. Rumage's cancer, was "mere guesswork." *Id.*

Accordingly, the district court did not abuse its discretion in finding that Dr. Boniol's methodology was unreliable with respect to general and specific causation.

## C

After excluding the affidavit of Dr. Gould and the testimony of Dr. Boniol, the district court found that Appellants had failed to prove general and specific causation.  On that basis, the district court granted summary judgment as to Appellants LPLA and negligence claims.  We find that the district court did not err in doing so.

"To be sure, expert testimony is not required in every LPLA case.  Plaintiffs may sometimes 'rely on lay testimony alone.'" *Stewart v. Capital Safety USA*, 867 F.3d 517, 520 (5th Cir. 2004).  But "[a]s both this Court and Louisiana courts have recognized, for expert testimony not to be required in a products liability case, 'the product itself, or at least the . . . feature in question, must be relatively uncomplicated, and the implications . . . such that a layman could readily grasp them.'"  *Id.* at 521 (quoting *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 184 (5th Cir. 1990), *abrogated on other grounds by Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir. 1994) (en banc)).  "Consequently, courts consistently require expert testimony in products liability cases, even when the products in question are in common use." *Id.*  The same principles apply to negligence claims based on exposure to hazardous products.  *See, e.g.*, *Gowdy v. Marine Response Corp.*, 925 F.3d 200, 206–07 (5th Cir. 2019) (noting that an expert is required "to rebut the defense expert's opinion that second-hand smoke, rather than hazardous chemicals, caused the plaintiff's cancer").

In this case, a jury would be asked to determine whether Dr. Rumage was actually exposed to arsenic-contaminated Roundup, and if so, whether that exposure caused him to develop squamous cell carcinoma, as opposed to

alternative causes. *See Stewart*, 867 F.3d at 521. "Thus, a jury would be confronted with questions that require a degree of familiarity with such subjects as" etiology, epidemiology, toxicology, and others. *Id.* "This case therefore raises questions that are of 'sufficient complexity to be beyond the expertise of the average judge and juror' and that 'common sense' does not 'make obvious.'" *Id.* (quoting *Morgan v. Gaylord Container Corp.*, 30 F.3d 586, 590–91 (5th Cir. 1994)). Accordingly, Appellants were required to provide the jury with expert testimony related to general and specific causation to survive summary judgment. Appellant's have failed to do so.[8]

## V

The district court's evidentiary rulings are AFFIRMED. As Appellants have failed to demonstrate a genuine dispute of material fact as to general and specific causation on their LPLA and negligence claims, the district court's order granting partial summary judgment to Monsanto on these claims is AFFIRMED. Further, the district court's order granting partial summary judgment on the redhibition and survival claims is AFFIRMED.

---

[8] The district court also held that Dr. Boniol was not qualified as an expert. Because we agree that Dr. Boniol's general and specific causation methodology was insufficient and affirm the district court on these points, we need not reach the issue of Dr. Boniol's qualifications.